LAWRENCE J. MILLER *v.* COMMISSIONER
OF CORRECTION
(15421)

Borden, Berdon, Palmer, McDonald and Peters, Js.

Argued March 25—officially released August 26, 1997

*James A. Killen,* assistant state's attorney, with whom, on the brief, was *Patricia M. Gilbert,* supervisory assistant state's attorney, for the appellant (respondent).

*Joseph G. Bruckmann,* public defender, with whom was *Eugene J. Riccio,* for the appellee (petitioner).

*Opinion*

BORDEN, J. In *Summerville* v. *Warden,* 229 Conn. 397, 422, 641 A.2d 1356 (1994), this court held that "a substantial claim of actual innocence is cognizable by way of a petition for a writ of habeas corpus, even in the absence of proof by the petitioner of an antecedent constitutional violation that affected the result of his criminal trial." This appeal presents a question that we found unnecessary to answer in *Summerville,* namely, "what is the legal standard [of persuasion] that must be met by a habeas corpus petitioner claiming actual innocence in order to gain a new trial at which his guilt or innocence will again be determined?" Id., 432.

The respondent, the commissioner of correction, appeals from the judgment of the habeas corpus court.[1] That court granted the writ and the request of the petitioner, Lawrence J. Miller, for a new trial for the crimes of which he currently stands convicted, and ordered

---

[1] The respondent appealed, upon a grant of certification to appeal by the habeas court, from the judgment of that court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

the petitioner released unless the state's attorney for the judicial district of Danbury files a timely written notice of intention to retry him for those crimes. The respondent claims that: (1) the habeas court employed an improper standard for evaluating the petitioner's claim of actual innocence; and (2) under the respondent's proposed standard, or under any appropriate standard, the evidence does not support the determination of the habeas court that the petitioner is actually innocent. We conclude that the proper standard for evaluating a freestanding claim of actual innocence, like that of the petitioner, is twofold. First, the petitioner must establish by clear and convincing evidence that, taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial—he is actually innocent of the crime of which he stands convicted. Second, the petitioner must also establish that, after considering all of that evidence and the inferences drawn therefrom as the habeas court did, no reasonable fact finder would find the petitioner guilty of the crime. Because the habeas court employed the proper standard of persuasion, and because the determinations by the habeas court that the petitioner is actually innocent and that no reasonable fact finder would find the petitioner guilty withstand the appropriate scope of our appellate review of those determinations, we affirm the judgment of the habeas court.

In July, 1982, the petitioner was charged with two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1),[2] arising out of an incident involving two teenage victims on the evening of August

[2] General Statutes § 53a-59 provides in relevant part: "Assault in the first degree . . . . (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

20, 1981. After a jury trial that was held in November, 1983, the petitioner was found guilty on both counts and, in January, 1984, the trial court, *W. J. Sullivan, J.*, sentenced him to two consecutive sentences of sixteen years each, for a total effective sentence of thirty-two years. On direct appeal, this court affirmed his convictions in March, 1987. *State* v. *Miller*, 202 Conn. 463, 522 A.2d 249 (1987). In November, 1992, the petitioner filed a pro se petition for a writ of habeas corpus claiming, among other things, that "I am factually innocent of the crimes of which I was convicted." Ultimately, habeas counsel was appointed to represent the petitioner, and an amended petition was filed that reasserted that "[t]he [p]etitioner is factually innocent of the charges."[3] After an extensive evidentiary hearing held in late 1995 and early 1996, the habeas court, *Bishop, J.*, agreed with the petitioner's contention, and rendered judgment granting the writ and a new trial, and ordering the petitioner's conditional release. This appeal followed.

I

In order to understand the issues in this case, it is necessary to review both the facts that the jury could reasonably have found in the petitioner's criminal trial, as described in the criminal appeal, and the facts as found by the habeas court. We therefore set them out separately.

A

The Criminal Appeal

On the petitioner's direct appeal from his convictions, this court described the facts that the jury reasonably could have found as follows. "On the evening of August 20, 1981, at approximately 8:30 p.m., fifteen year old

---

[3] In the amended petition, the petitioner also alleged prosecutorial misconduct and ineffective assistance of counsel at his criminal trial. He later withdrew those claims, and relied only on his claim of actual innocence.

Elizabeth, and a sixteen year old male friend, William, were viciously assaulted behind the United Methodist Church on Clapboard Ridge Road in Danbury. The assault took place in an area used as a gathering place by neighborhood youths. Their assailant was a white male whom the couple encountered as they were leaving the area to walk to Elizabeth's house a short distance away. When he approached the young people, the assailant, who was wearing a bandanna across the lower portion of his face, grabbed William's arm, displayed a handgun and identified himself as a police officer.

"The couple was forced at gunpoint to walk to a grassy area where William was made to kneel. The assailant produced handcuffs and, using one hand, quickly handcuffed William's wrists behind his back. William was instructed to lie on his stomach and the assailant removed his own belt, and bound William's ankles. He then grabbed Elizabeth's arm and pulled her down an embankment out of William's sight. She was ordered to remove her jacket and, when she refused, a struggle ensued. During the struggle, the girl punched and scratched her assailant, and the man struck her several times on the head with the gun. In the course of the struggle with Elizabeth, the bandanna, which the assailant had been wearing, came off his face. Thereafter, Elizabeth stumbled, fell to the ground and lost consciousness. When she revived, the man, his face uncovered, was crouched a few feet from where she lay. He then grabbed her foot and began dragging her further down the embankment. While he was doing so, Elizabeth's sneaker came off. She recovered it and threw it at her assailant, striking him in the crotch area. This precipitated another struggle during which the assailant kicked Elizabeth in the stomach, and repeatedly struck her about the head with the gun until she again lost consciousness.

"Approximately five or ten minutes after pulling Elizabeth down the embankment the man returned to William. He removed the belt from around William's ankles and placed it around William's chin. The assailant then pulled on the belt and shoved the gun in William's mouth, injuring him. The belt was then slipped around William's neck and tightened, strangling him until he lost consciousness. When William regained consciousness, the man was gone and William made his way to Elizabeth's house where he alerted her parents and help was summoned. A search was immediately launched and Elizabeth was found lying in the area behind the church in a semiconscious state, partially naked and covered with blood.

"Both victims were taken to the Danbury Hospital that night. Elizabeth's injuries consisted of a laceration of the liver, a fractured jaw, fractures of her hands, and numerous head and facial lacerations. She required surgery, and was hospitalized for a period of three to four weeks, a portion of which she spent in intensive care. William's injuries included multiple head and facial lacerations, and a laceration of the soft palate caused when the barrel of the assailant's gun was jammed into his mouth. He was confined to the hospital for a week.

"At trial Elizabeth made a 'positive' in-court identification of the [petitioner] as her assailant. She also testified that she had made an out-of-court photographic identification of the [petitioner], at Danbury police headquarters on April 1, 1982. She further testified that she had positively identified the [petitioner] as her assailant at a chance meeting in the area of the checkout counters at the Bradlees Department Store [Bradlees] in Danbury on July 12, 1982. It is undisputed that the meeting at Bradlees was inadvertent and that it was not arranged by the police. William, who never saw his assailant without the bandanna covering the lower

portion of his face, was unable to make an identification of the [petitioner].

"The [petitioner], who was employed at the time of the crime as a correction officer at the federal correctional institution in Danbury, testified at his trial. He denied his involvement in the incident, offered an alibi defense and testified that at the time of the crime, he was visiting at the home of his sister in Brewster, New York. His testimony was supported by the testimony of his sister, his mother, his wife and a friend of the [petitioner's] sister." *State* v. *Miller*, supra, 202 Conn. 465–67.

This court also addressed the petitioner's claim on his direct appeal "that his federal and state constitutional rights to due process of law were violated by the trial court's denial of his motion to suppress both the out-of-court and in-court identifications of him made by Elizabeth." Id., 470. Because these identifications played a significant role in the habeas court's findings, we summarize our discussion of the petitioner's claims on direct appeal.

We first agreed with the trial court's determination that the identification procedures were not suggestive. Id., 471. In support of that determination, we referred to the following evidence adduced at the hearing on the motion to suppress. Between August 20, 1981, and April 1, 1982, Elizabeth viewed approximately 400 photographs of white males without making an identification. On April 1, 1982, she viewed an array of seven color photographs of white males, which included a photograph of the petitioner taken the previous day. She identified that photograph as depicting her assailant, indicating that she was "99 percent sure" but that she could not be more definite without seeing the subject of the photograph in person. Id.

The petitioner argued that, even if this identification was not unnecessarily suggestive, it, as well as Elizabeth's subsequent corporeal identifications of the petitioner at Bradlees and in court, were tainted by the previous identification procedure. That previous identification procedure was that, in September, 1981, two " 'old photographs' " of the petitioner were shown to Elizabeth as part of the 400 photographs shown to her and, in January or February, 1982, a third " 'old photograph' " of him was shown to her as part of an array of six black and white photographs. Id., 472. Elizabeth did not identify the petitioner as her assailant from these photographs. We rejected the assertion that the pictorial recurrence tainted Elizabeth's April 1, 1982 photographic identification of the petitioner or rendered the identification procedure suggestive. Id., 473. We reached this conclusion because of the time lapse between the previous photographic showings and the subsequent identifications, the dissimilarity among the various photographs of the petitioner, and the difference in his appearance in the April 1, 1982 photograph from the previously shown photographs. Id.

Finally, we rejected the petitioner's claim that, even if the identification procedures were not suggestive, Elizabeth's identification was not reliable. Applying the totality of circumstances test, we concluded that "even if the identification procedure employed was unnecessarily suggestive, Elizabeth's out-of-court and in-court identifications were sufficiently reliable" to be admissible. Id., 475.

We also rejected the petitioner's claim on direct appeal challenging the trial court's admission of certain testimony regarding the handcuffs that the assailant had used on William. James Rimel, the provost marshall for the United States Department of Defense supply depot in Mechanicsburg, Pennsylvania, testified that the handcuffs had been purchased from Peerless Manu-

facturing Company (Peerless), and received by the depot in 1977. He also testified that the depot supplied handcuffs to the United States Department of Defense, United States Department of Justice and federal correctional institutions, including the federal correctional institution in Atlanta, Georgia. He could not, however, testify when or to what governmental agency that particular set of handcuffs had been shipped. The petitioner had been employed from December, 1977, to July, 1978, at the federal correctional institution in Atlanta, and at the time of the assault in this case was a correction officer at the federal correctional institution in Danbury. Id., 481. This court upheld the trial court's ruling admitting Rimel's testimony because it "had some tendency to prove that the [petitioner] may have had access to handcuffs of that brand name." Id., 482.

## B

### The Habeas Hearing

The habeas court issued a lengthy and detailed memorandum of decision in which it referred to "substantial details of the [criminal] trial evidence" because, in its view, "the evidence adduced at the habeas hearing both adds to and implicates the reliability of the underlying conviction . . . ." A brief discussion of some of that criminal trial evidence, as summarized by the habeas court, follows because the habeas court's ultimate determination of actual innocence was made after consideration of that evidence, taken together with the habeas corpus evidence.

### 1

### The Criminal Trial Evidence

The habeas court noted that the petitioner had been convicted on the basis of circumstantial evidence and the positive identification of him by Elizabeth. Among

the trial evidence that the habeas court specifically delineated was the following.

William testified that as he and Elizabeth passed through the area of the crime, they saw a man on the side of the swing set, who approached them and said he was a police officer. The man was wearing a blue bandanna across the bridge of his nose, with his eyes and forehead visible. The man, who was holding a gun in his right hand and was pointing it at them, was approximately five feet, ten inches tall, with brownish blond hair containing traces of grey, a receding hairline, and a reddish complexion. He was fat, with a small pot belly, and appeared to be between thirty-five and forty-five years of age. When the man strangled William with the belt, William passed out, and after regaining consciousness he went to Elizabeth's nearby house for help. Although William was never able to identify his assailant, William testified that the man whom he and Elizabeth later saw at Bradlees was the petitioner.

Elizabeth testified as follows. At the time of the assault, she was wearing jeans, sneakers, a light green shirt and a sweat jacket. She first saw the assailant from a distance of approximately fifty feet, when he was in the area of the swing set. He had a large build, a fat forehead, and blondish brown hair with grey growing through it. He was approximately five feet, nine inches to five feet, ten inches tall, and fat. After the man started pulling Elizabeth down the hill, she struggled with him and he told her to take her jacket off. He then pulled at the front of her jeans, and managed to get her jacket off. She hit the man with her hand, and he struck her with the gun. He called her a " 'slut' " and she swore back at him. During this struggle, after he had struck her head four or five times, the bandanna came off the man's face and she was able to see him clearly. At one point after the bandanna fell from his face, he put it

around her neck and tied it tightly, and she stumbled and fell and lost consciousness.

When Elizabeth regained consciousness, the man was crouched in front of her a few feet away and was laughing. He then grabbed her foot and dragged her further down the hill. She did not know whether she had her clothes on at this point. The man then resumed hitting her in the head with the gun, and she lost consciousness again. While she was conscious, however, she was able to observe the man's facial characteristics at a distance of approximately two to three feet, for approximately two to three minutes. He had a fat forehead with lines in it, a reddish complexion, and a large, fat face. He appeared to have a double chin. He was in his early forties, and he reminded her of "Archie Bunker."[4] When she awoke, she did not know whether she had her clothes on, but it was cold and dark, and she thought she had a sweat jacket wrapped around her neck.

Elizabeth also acknowledged having given a written statement on September 4, 1981, in which she had described the assailant as five feet, six inches tall, with broad shoulders, husky with a small pot belly, with brown, slightly wavy hair combed straight back and a lot of grey going through it, and a reddish face with a thickly lined forehead. He looked like Archie Bunker regarding his hair, the shape of his face, and possibly his eyes, and was wearing a light blue vee neck shirt. She also acknowledged that in this statement she had indicated that the man held the gun awkwardly in his left hand, while he held the handcuffs with his right hand.

After having viewed at least two photographic arrays in which Elizabeth had not identified the petitioner's photograph, Elizabeth first identified the petitioner

[4] Archie Bunker was the character played by Carroll O'Connor in the television show, "All In The Family." He was a middle-aged white male, with a round face and receding hairline.

from an array on April 1, 1982, when she told the police that she was "99 percent sure" but wanted to see him in person before making a 100 percent identification. Thereafter, accompanied by the Danbury police, she went to a church parking lot in Brewster, where on three occasions she observed people departing from church services but recognized no one.[5]

Elizabeth also testified that on July 12, 1982, while she and William were shopping at Bradlees, she recognized the petitioner as their assailant. She and William followed his car in their car, and he took an exit from the highway that brought him close to Clapboard Ridge Road. Shortly after this incident was reported to the police, the petitioner was arrested. During the trial, Elizabeth made a positive identification of the petitioner as her assailant.

Danbury police detective Nelson Carvahlo, who took over the investigation in September, 1981, first spoke with Elizabeth two or three days after the incident, while she was in the intensive care unit. Using an "identi-kit," he made a composite sketch of the assailant, on the back of which he noted the characteristics of the assailant as reported to him by Elizabeth. These were, in pertinent part: a white male, five feet, seven inches to five feet, eight inches tall, very heavy, weighing approximately 200 pounds, having dark hair with grey going through it, who reminded her of Archie Bunker.

Two fellow employees of the petitioner at the correctional institution in Danbury gave inculpatory testimony. William McChesney testified that the petitioner's hair color at the time of trial was darker than in 1981, when it had been " 'reddish brown or reddish blonde.' "

---

[5] There was other testimony in the criminal trial that, on at least one of these occasions, the petitioner exited the church and walked by the car in which Elizabeth was seated, but that she was looking in a different direction from which he was walking.

Stephen Hawes testified that when the petitioner came to work starting at midnight on August 20, 1981, he had abrasions across his knuckles and the back of his hand, and a red mark running down his face, and that he looked like he had been in a fight. Hawes also acknowledged that he had not reported this information to anyone until shortly before the trial, when he contacted the Danbury state's attorney's office.

The habeas court also noted the evidence from the criminal trial regarding the available light at the time and place of the assaults. The court noted that, although "the victims' actual opportunity to see their assailant was the subject of scrutiny," records from the Naval Observatory indicated that sunset in Danbury on that day was at 7:46 p.m. In addition, there was testimony from the proprietor of a nearby liquor store that at approximately 8:05 p.m., twenty-five minutes before the assault took place, "it was dark, but not pitch dark."

Miller testified in his own defense. He testified that he lived with his wife of seventeen years and their two children. He denied any involvement in the assault, and denied having sustained any cuts or scratches on the evening in question. He acknowledged having been in Bradlees on July 12, 1982, and that he may have taken an exit from the highway close to Clapboard Ridge Road, which was a route that he previously had used to get home.

On the evening of August 20, 1981, he, his wife and children had visited his sister's house in New York, where they were leaving the children in preparation for a vacation trip to Atlantic City, New Jersey, on August 21, 1981. In fact, he and his wife traveled to Atlantic City on August 21, 1981, and he produced a receipt from a hotel in that city documenting his presence there for that entire weekend.[6]

---

[6] On cross-examination, the petitioner was questioned about a woman named Donna Colucci from Newark, New Jersey. On the basis of this cross-

The petitioner also testified that he had gained forty or fifty pounds since the summer of 1981, and submitted several photographs to substantiate that testimony. He also testified that he had never dyed or colored his hair.

The petitioner's wife testified that she was with the petitioner and other family members and friends in Brewster on the evening in question, preparing for their trip the next day to Atlantic City, on which she accompanied him.[7] She also testified that the aforementioned photographs were taken of him on their vacation in July, 1981, and showed his hair and weight as it then had appeared. She corroborated his testimony that he had gained much weight since the end of 1981. She also denied that he had any scratches or marks on his face or arms on the night in question.

The testimony of the petitioner and his wife was supported by the testimony of Debra Lyn Oeschschlager, a family friend, who testified that she was with them on the night of August 20, 1981, and that the petitioner was present when she left at approximately 8:30 p.m. She also testified that the petitioner did not have blond or grey hair that summer, and that he had been a lot thinner in the summer of 1981 than he appeared at the time of the trial.

### 2

### The Habeas Hearing Evidence

The habeas hearing commenced with the testimony of Daniel Johnston, who is currently serving a life sen-

---

examination, the jury could have inferred that Colucci was married to an inmate at the correctional institution in Danbury, and that she had made the reservations at the Atlantic City hotel. This line of testimony was admitted for the purpose of impeaching the petitioner's credibility, and the habeas court concluded that the petitioner "did not deal effectively with questions relating to his holiday in Atlantic City."

[7] Although the habeas court did not specifically advert to it, in the criminal trial the petitioner's sister also testified that the petitioner and his wife were at her home on the evening of August 20, 1981, from approximately 6:30

tence for murder in New York. While incarcerated in New York, Johnston had confessed to attorney Richard Emanuel, who was then representing the petitioner, that he, and not the petitioner, had been the perpetrator of the assaults on the two teenage victims in Danbury on August 20, 1981.[8] Johnston testified in the habeas hearing, giving what the habeas court described as "a detailed inculpatory statement of his involvement in the August 20, 1981 assaults on Clapboard Ridge." In addition to Johnston's testimony, the habeas court heard what it described as "considerable other evidence bearing on the [petitioner's] innocence." The habeas court divided this other evidence into four categories: (1) physical evidence; (2) the history of Johnston's statements regarding the assaults; (3) identification evidence; and (4) circumstantial evidence. The habeas court made the following specific factual findings regarding each category of evidence.

a

## Physical Evidence

The habeas court found certain facts regarding four types of physical evidence. The court relied on this physical evidence in arriving at its judgment in the petitioner's favor.

The first type involved the gun used by the perpetrator of the assaults. In the criminal trial, although the

until 8:30 or 9 when they left their two children with her for their trip to Atlantic City the next day. She also testified that, when they returned from Atlantic City on the following Sunday afternoon, the respondent gave her an "Atlantic City" sweatshirt, which was then introduced into evidence.

[8] On the basis of Emanuel's affidavit recounting the fact of Johnston's confession, the habeas court determined that the petitioner was entitled to an evidentiary hearing on the merits of his actual innocence claim, and that Johnston was a material witness regarding that claim. Thereafter, Johnston was brought before a New York court, where he stated his intention to testify in these proceedings. After being brought to Connecticut, the habeas court appointed counsel for Johnston, and he was represented by that counsel throughout the habeas proceedings.

state introduced into evidence two metal objects that the police had found at the scene of the crimes, the state did not introduce the gun because it had not been found, and the state did not introduce any evidence identifying the two metal objects. On the basis of the habeas testimony, the habeas court found that, during the investigation of the assaults, the Danbury police had determined that the metal objects came from a Marksman pellet pistol.

Johnston testified as follows regarding the gun and the metal objects. During 1981, he lived at 4500 East Ocean View Avenue, Norfolk, Virginia, in an apartment complex of which he was the manager. His duties included making repairs to tenants' apartments, thus giving him access thereto. He testified further that he had burglarized several apartments, and that in late 1980 or early 1981, he stole a Marksman pistol from one of the apartments. He identified one of the two metal objects, later identified as a "slide," as a piece that broke off the pistol while he had been holding the pistol by the barrel and striking Elizabeth. Johnston noted that there were initials on the slide that had not been there when he possessed it. This was corroborated by the subsequent testimony of a Danbury police officer that he had put his initials on the slide for evidentiary purposes when he recovered it from the crime scene. Johnston could not identify the other metal piece, however, which appeared to be a spring. Johnston also identified a Marksman pellet pistol as identical to the pistol that he had used in the assaults.

The habeas court also specifically credited the testimony of two other witnesses, whom the court found to be knowledgeable and trustworthy, and whose testimony "relating to the gun provides reliable corroboration which enhances the persuasiveness of Johnston's inculpatory testimony." Dennis Catona, a firearms expert, identified the slide as an exact match for the

particular make and model of Marksman pellet pistol that Johnston had identified. Catona also identified the spring as from the same make and model, and indicated that the spring would have been ejected if the slide had fallen off. He also explained that this model was not sturdy enough to withstand a hard impact, and that, upon such an impact, it would break and the spring and slide would break apart.

Jack Lee Zollars, of Portsmouth, Virginia, testified that he had been the owner of a Marksman pistol exactly like the one previously identified. In 1981, he had moved to the same apartment complex in which Johnston lived and managed. He kept the pistol in a closet in his apartment. He moved from the apartment in early 1982, and when he unpacked from the move he discovered that the pistol was missing, and assumed that he had lost it in the move because he had not loaned it to anyone or taken it outside and misplaced it. Zollars also confirmed that, while he lived at the apartment, Johnston had been the manager and that he had done repairs as needed in tenants' apartments. Zollars had not seen or heard from Johnston since he had moved from the apartment complex in 1982.[9]

The second type of physical evidence was evidence of a sexual assault committed on Elizabeth. In the criminal trial, the state had not offered any such evidence and had indicated in a response to a discovery motion that it was not pursuing any claim of such an assault. Only portions of the Danbury Hospital records were introduced into evidence.

---

[9] Subsequent testimony disclosed that Zollars had been located by the investigator for the petitioner's counsel through the use of a CD-ROM program containing thousands of names, addresses and telephone numbers. Combining this program with a list of tenants at the apartment complex, the investigator found Zollars after making approximately 300 telephone calls. Zollars told the investigator that he had owned the Marksman pistol while living at the apartment and had discovered that it was missing in 1982.

The habeas court found, however, that Elizabeth had been sexually assaulted by Johnston. This finding was based on Johnston's testimony, the complete hospital record, other testimony at the habeas hearing, and portions of the criminal trial record.

Johnston testified that he had sexually assaulted Elizabeth, having vaginal, anal and oral intercourse with her, although without having ejaculated. He claimed that she was conscious during the sexual assault, and that she compliantly removed her clothes and participated with him in the sexual activity. The habeas court specifically did not credit the portion of Johnston's testimony suggesting compliance on Elizabeth's part, finding that his "testimony concerning the *manner* of his sexual assault [was] both elaborate and fantastic," and that it was more "the product of a perverse braggadocio and hatred of women than an accurate account of the details of his vicious attack." (Emphasis added.) In this respect, the habeas court specifically noted Elizabeth's criminal trial testimony that, when she struck her assailant in self-defense, he called her a " 'slut.' " The habeas court also specifically credited the habeas testimony of officer Daniel Mallory Stephens of the sheriff's department in Putnam County, New York, based on his experience in investigating sexual crimes, that sexual perpetrators often are untruthfully boastful regarding their own prowess. The court also noted in this respect Johnston's history of sexual violence against women. See part I B 2 d of this opinion.

The habeas court also specifically found that the presence in the hospital records of evidence of a sexual assault corroborated Johnston's testimony and, accordingly, the petitioner's innocence. The court noted that, after the assault, Elizabeth had been found nude. The admission note of the emergency room physician indicated that she had stated that she had been "raped." This was corroborated by an internal police report of

a Danbury police officer, who went to the emergency room, that a doctor said that the victim had been raped. The hospital record also indicated that there were grass particles in her pubic area, a bloodstain on her vulva with no laceration, and bloodstained fluid in her vagina. Laboratory tests indicated no sperm in the vagina, but a "[w]eak positive" test for seminal acid phosphatase. During her stay in the hospital, Elizabeth had a small amount of "pinkish tan vaginal discharge," and a gynecological consultation indicated that, although tests could not confirm intravaginal ejaculation, there was some introital bruising. In addition, the records indicate that Elizabeth's mother had stated that Elizabeth had told her she had been raped and assaulted. There was also information in the record to indicate that, although Elizabeth freely discussed various aspects of the assault, she did so with considerable denial. The discharge diagnosis by the hospital was of a probable rape and contusion.

Also testifying at the habeas hearing were state's attorney, Walter Flanagan, and Elizabeth. Flanagan testified that he had ruled out a sexual assault prosecution because Elizabeth had told him that no sexual assault had occurred, and that the hospital records did not support such a prosecution. Elizabeth denied that she had removed her clothing, and that any sexual assault occurred while she was conscious. She did not know, however, what had happened while she was unconscious.

Although cognizant that the quality of the evidence available to Flanagan might not have supported a prosecution for sexual assault, particularly in light of Elizabeth's assertion that none had occurred, the habeas court disagreed that there was no such evidence. Thus, the habeas court found that "the physical evidence more clearly supports a conclusion that this brave young victim resolutely resisted, but was ultimately overcome

by the more powerful and frenzied behavior of her assailant. The female victim's testimony that the assailant pulled at the front of her pants, coupled with the finding by the police of the female victim's clothing torn and strewn about the area of her assault, supports a finding that the assailant forcibly ripped the victim's clothing from her as she struggled with him. This crime scene evidence, coupled with the physical evidence found during examinations at the hospital, and the statements made to caregivers at the hospital, support the hospital's discharge diagnosis that the female victim was the probable victim of rape."

The third type of physical evidence concerned the Peerless handcuffs. Johnston testified that he had stolen the handcuffs from an apartment in the Norfolk apartment complex, which had been occupied by a woman named Roxanne, who used them to handcuff her child to a crib when she wanted to go out. He testified that the handcuffs were Navy property, and that many sailors from the aircraft carrier U.S.S. Nimitz, which had been stationed in Norfolk, lived in the complex. This aspect of Johnston's testimony was corroborated in part by the testimony of Zollars that a woman named Roxanne had lived in the complex while Zollars lived there in 1981, and evidence from the Navy that the Nimitz had been homeported in Norfolk and was in the general area in early 1981. There was also evidence from personnel of the United States Department of Defense that, pursuant to a contract with Peerless, 10,500 pairs of handcuffs had been delivered in 1977 and 1978 to various facilities, including the supply depot in Mechanicsburg, and that 700 pairs of such handcuffs were slated to be sent to the Norfolk naval facility.

The habeas court concluded from this evidence that no reasonable inference could be drawn concerning the particular facility from which the handcuffs in question were obtained. The court found further that both the

petitioner and Johnston had access to handcuffs, that there were several thousand Naval personnel at Norfolk during the period in question, that there were no restrictions prohibiting Norfolk military police personnel from bringing handcuffs to their homes after duty hours, and that Johnston had access to all of the East Ocean View Avenue apartments.

The fourth type of physical evidence was evidence that, immediately after the assault, both Elizabeth and Johnston had a similar rash on their buttocks attributable to either poison ivy or poison sumac in the area where the assault occurred. At the criminal trial, both victims had described the area as " 'grassy,' " and photographs of the scene showed areas of mixed vegetation, including low growing leafy plants. According to Elizabeth's criminal trial testimony, after she had lost and regained consciousness, she saw her assailant crouched down a few feet in front of her. He then grabbed her foot and dragged her down a hill, and she did not know whether at that time she had her clothes on.

The Danbury Hospital records of August 24 and 25, 1981, indicated that Elizabeth had a red rash, described as poison ivy, on her buttocks, for which she was treated with calamine and a cortisone based ointment. Records of a hospital in Chesapeake, Virginia, indicated that Johnston was admitted on August 23, 1981, for pneumonia. The emergency room admissions note indicated that he had just returned from New York where he had stayed two or three days. The note of August 24, indicated a rash on his buttocks and lower back diagnosed as " 'contact dermatitis, most likely poison ivy or sumac,' " and further indicated a history taken from him of his having had exposure to plants or vines on the day or two prior to his admission. The habeas court found these consistent medical findings to be "a notable circumstance."

b

### Johnston's Statements

There was extensive testimony in the habeas hearing regarding statements that Johnston had made to others about the assaults in question, culminating in his in-court testimony. The habeas court found that, over the course of several years, Johnston had talked about the assaults to several people in various contexts, and that his statements ranged from gratuitous expressions of familiarity and intimations to his ultimate confessions. The court specifically found that his early expressions of interest in and knowledge of the assaults, his reported demeanor in making the statements to others, and his ultimate inculpatory statements, were "probative . . . that he, and not [the petitioner], was the Clapboard Ridge assailant." The habeas court divided these various statements into five categories.

The first category of Johnston's statements involved early conversations with the petitioner and his family. The habeas court specifically credited the testimony of Elizabeth Miller, the petitioner's wife, regarding several conversations and other contacts with Johnston. In this regard, the court was "mindful of Mrs. Miller's obvious interest in this matter," but nonetheless "found her to be a credible and sincere witness," and credited "her testimony concerning her various contacts with Johnston as accurate and true."

The first of these contacts was in the fall of 1982, after the petitioner had been arrested in New York state, where he lived and was out on bond, but before he had waived extradition to Connecticut. While at their home in Patterson, New York, Elizabeth Miller saw Johnston arrive by car at their property. At that time, his physical appearance reminded her of the composite of the assailant that she had seen in the newspaper. She mentioned

this to the petitioner, who went outside to speak with him.

The habeas court also credited the petitioner's habeas testimony about his conversation with Johnston at that time. The petitioner and Johnston spoke to each other in the petitioner's driveway. Johnston appeared to be annoyed with the petitioner because the petitioner did not recognize him.[10] Johnston told the petitioner that he knew that the petitioner had not committed the crimes, and that he wanted to help the petitioner. The petitioner told Johnston to give any information he had to the police or to the petitioner's attorney, and Johnston told him that he would have to work on it. The habeas court found this account to be corroborated, not only by Johnston's testimony, but also by the testimony of Carvahlo, who had investigated the assaults, that when the petitioner had been arrested and brought to Connecticut, he told the police about this earlier meeting with Johnston.

After the petitioner's trial, Johnston returned to the petitioner's home. He left his printed business card, which was introduced into evidence at the habeas hearing, which had the following message on the reverse side: " 'Call me please, Dan Johnston Thank you.' " Elizabeth Miller telephoned Johnston at the number on the printed side of the card, and Johnston told her that he had heard that two people were involved in the crimes. Approximately two months later, Johnston returned to the petitioner's home, and told Elizabeth Miller that the petitioner "did not do it" and that he was working on it and would get back to her if he had more information.

The next contact between Elizabeth Miller and Johnston was in April, 1991, while the petitioner was incar-

---

[10] There was other evidence, which the habeas court credited, that the petitioner and Johnston had had contact with each other when the petitioner was an officer in the Putnam County sheriff's department.

cerated. She wrote to Johnston, who was then incarcerated in New York, expressing her awareness that Johnston had by then spoken with Emanuel and that Johnston had indicated to her that he had information that could help the petitioner, and asking Johnston for help. She did not hear from Johnston until the summer of 1995, when she received a letter from him, postmarked August 21, 1995, acknowledging her April, 1991 letter to him and indicating to her that "there is not a day that [goes] by that I do not read it." In this letter, Johnston also complained that Emanuel first had told him that the statute of limitations had run on the crimes and later told him that it had not run. Johnston indicated that he was upset and invited Elizabeth Miller to visit him.

Elizabeth Miller, accompanied by the petitioner's mother, visited Johnston in prison in New York for approximately two hours. While she and the petitioner's mother were seated in the visitor's room, Johnston entered the room and told them they were late. When she mentioned the traffic, he said " 'no, you're ten years late.' " Johnston told them that it had been going on long enough and that he wanted to make it right before they died. He told them that he was the person who had assaulted the two victims, that only three persons— he and the two victims—knew who did it, and that he would not talk to anyone about it except a judge. Johnston professed to have found God, and stated that this was what God wanted him to do. He apologized for what he had done to them and to the victims. During this conversation, no promises were made or requested, except that Johnston asked them to pray with him for forgiveness.

The second category of Johnston's statements involved conversations with members of the Putnam County sheriff's department. The habeas court specifically credited, as "truthful and accurate," the testimony

of retired Sheriff George Grenier regarding the contents of two conversations that he had had with Johnston.[11]

The first conversation took place in early 1982, at which time Grenier asked Johnston about the assaults. Johnston denied any involvement, and told Grenier that he had an alibi, namely, that he had been in the hospital in Chesapeake on the day of the assaults. Grenier called the hospital and learned that this was not true. The habeas court specifically found Johnston's attempt to fabricate an alibi to be evidence of his consciousness of guilt.

Grenier saw Johnston again in mid-1983, and asked him again about the petitioner. Johnston told him that the petitioner did not do it. When Grenier asked Johnston if he had done it, Johnston replied that he would not deny that he did it, but also would not admit that he did it. Johnston told Grenier that he would never go back to jail, and that he would kill himself first.

In the summer of 1985, Johnston also spoke with Daniel Stephens of the Putnam County sheriff's department. Johnston was driving his motor vehicle in the opposite direction of Stephens, when Johnston stopped his vehicle. Stephens knew from prior experience with Johnston that this meant that Johnston wanted to talk with him. After some "chit chat," Johnston said: " 'Remember Larry Miller. He's the wrong man.' " The habeas court found this incident to be "probative of Johnston's unusual and lingering interest in these assaults. It is part of the mosaic of proof of his guilt."

---

[11] The habeas court, however, specifically found certain aspects of Grenier's testimony *not* to be probative of Johnston's involvement and, thereby, the petitioner's innocence. The first of these was Grenier's suspicion, formed in early 1982, after both Johnston's release from Sing Sing prison on parole and the petitioner's arrest, but before the trial, that Johnston might be the assailant. This suspicion was based on Grenier's longstanding knowledge of Johnston. The second was Grenier's belief that the petitioner was not capable of committing the crimes in question.

The third category involved Johnston's statements to the New Milford police department. In February, 1983, after the petitioner's arrest but before his trial, Johnston, who had been arrested by the New Milford police department, indicated that he wanted to talk with detectives from, among others, Danbury and the Putnam County sheriff's department. An interview was arranged at the New Milford police department, at which were present eight detectives from various police departments. A tape recording of this interview did not surface until several days before the beginning of the habeas hearing in this case.[12] The habeas court listened to an enhanced version of the tape recording and heard testimony from two of the detectives who attended the taped interview.

The habeas court found that, although on much of the tape there is "little of substance" other than "bluster by Johnston," at one point Johnston was asked if he knew about " 'the Larry Miller case,' " and he replied, " 'You shafted him, that's why. He did not do it.' " When he was then asked, " 'What makes you think he got shafted?' " Johnston replied, " 'Cause he didn't do it, that's why.' " When he was asked, " 'You know for sure he didn't do it?' " Johnston replied, " 'You're damn right I know for sure he didn't do it.' " Later in the tape, Johnston was asked, " 'Why are you so upset about Miller?' " He replied, " 'What do you think?' " Johnston then said, " 'I don't like him.' " Johnston was then asked, " 'Why did you get upset if you don't like him?' " He replied, " 'Because I gave up a name on it when we

---

[12] The habeas court considered and rejected a claim that the failure to make this tape recording available to the petitioner at his criminal trial was a violation of due process of law under *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The habeas court concluded that, although the tape should have been made available to the petitioner, it was not "material" within the meaning of *Brady* because it is not likely that it would have changed the outcome of the criminal trial. The petitioner has not challenged that conclusion on appeal, and it is not before us.

started out, that's why.' " When Johnston was asked what the name was, he stated, " 'Gary Townsic,' " and claimed that he had given that name to Carvahlo.[13]

The habeas court specifically credited the following testimony of Gordon Allen, an investigator with twenty years of experience with the Putnam County sheriff's department, who was one of the eight detectives to attend the interview. Allen had known Johnston from having interviewed him in connection with various criminal investigations. Johnston sat at the head of a conference table with eight detectives in attendance. At the beginning of the interview, Johnston appeared to be enjoying the attention, and was not saying anything of benefit to any of the detectives. It was Allen who asked Johnston about the petitioner's case. At that time, Allen was aware of the fact that Johnston knew the petitioner. Allen also recalled that Johnston said that he knew that the petitioner did not "do it," and that Johnston stated that he had even gone to the petitioner's residence and told the petitioner's wife that the petitioner did not do it. During the more focused questioning about the petitioner, Johnston's demeanor changed from his previous relaxed appearance, and he became agitated, red in the face and loud. The habeas court specifically found that this interview was probative of the petitioner's claim of factual innocence because it demonstrated Johnston's unusual interest in the Clapboard Ridge assaults.

The fourth category of Johnston's statements involved his contacts with Emanuel, who represented

[13] The habeas court specifically found that at one point in the interview, while Johnston was discussing the Clapboard Ridge assaults, the tape stops and resumes at a later point in the interview, "making it clear that some portion of his comments relating to these assaults was not transcribed." The court found, based on the testimony of Danbury police detective Robert Lollie, that at that point one side of the tape came to an end and, while Johnston continued to talk, Lollie turned the tape over, "thus not recording what was said by Johnston in the process."

the petitioner on his criminal appeal and in the habeas proceedings until just before the hearing, when he withdrew because he had been informed that he was likely to be called as a witness by the respondent. The habeas court specifically credited Emanuel's testimony regarding these contacts, finding it to be "accurate, detailed and trustworthy."

In early 1985, Elizabeth Miller called Emanuel regarding Johnston, and sent Emanuel the business card that Johnston had left at her home. Emanuel was first able to contact Johnston by telephone in April, 1985, and they met on May 7, 1985. At this meeting, Johnston told Emanuel that the petitioner was innocent and that he wanted to help the petitioner "clear it up." He told Emanuel that he had been a suspect but that he had an alibi, namely, his admission to the Chesapeake hospital on the day of the assaults, and that Sheriff Grenier had confirmed it. Johnston also told Emanuel that he was not fond of the petitioner, but that he hated to see an innocent man convicted, and he gave Emanuel the name of his brother, David Johnston, a retired Danbury police officer.

Emanuel contacted Grenier and learned that Johnston's alibi had not been confirmed. Emanuel, by now suspicious of Johnston, spoke with him again in June, 1985, but the conversation was unremarkable. Subsequently, Emanuel wrote to Johnston in prison, after Johnston had been arrested for murder in December, 1985. Emanuel tried to visit Johnston, but Johnston refused to see him. Johnston also refused to accept a letter that Emanuel wrote to him in December, 1986.

On December 20, 1989, after an exchange of letters in which Johnston agreed to see Emanuel, they met in a New York prison. Johnston told Emanuel that he had relevant information about the assaults but that, although he would not give him the information then,

he would be willing to do so "during calendar year 1990." Johnston told Emanuel that the information he would provide would clear up the crimes, and gave Emanuel some names of people who, he said, perhaps were involved or knew something about the crimes. Immediately following this meeting, Emanuel wrote to Johnston, and then again in January, 1990, April, 1990, March, 1992, and August, 1992, without response.

In February, 1993, Emanuel again wrote twice to Johnston, enclosing newspaper articles criticizing the state department of correction for granting the petitioner a furlough. The habeas court specifically found that Emanuel sent these articles to Johnston in an effort to provoke him to candor, and that they did not feed information about the assaults to him.

In July, 1994, attorney Paula Mangini Montonye, of the public defender's office, who was also representing the petitioner, wrote to Johnston suggesting that she intended to subpoena him as a witness in the habeas proceedings, and asking him to provide her with any information he might have. Johnston replied to Montonye by letter in October, 1994, indicating that he was working on the appeal of his murder conviction, that he would not be scheduled for parole until 2027, and would talk with nobody until he got a fair trial on that conviction. He further suggested that, considering when he would be eligible for parole, he probably would die before serving all of his time, that he would make no deals, and that she should feel free to write to him again. In November, 1994, she responded, indicating that she had not intended to threaten him but had simply wanted to meet him face to face, and reiterated that desire. Johnston did not respond.

On July 19, 1995, however, Johnston, Emanuel and Montonye met at the Great Meadow Correctional Facility in New York. Prior to that meeting, Emanuel had

reached an agreement with Flanagan whereby (1) Emanuel, on the petitioner's behalf, would move for modification of the petitioner's sentence before the original sentencing court, (2) Flanagan would not oppose the motion and would not comment at the resentencing hearing, and (3) this habeas petition would be withdrawn. Before going forward with this agreement, however, Emanuel decided to try one more time to see Johnston.

On July 19, 1995, Emanuel and Montonye traveled to Great Meadow without advance notice to Johnston in hopes that he would meet with them. Johnston did so. When they first greeted Johnston, Emanuel reintroduced himself and introduced Montonye to Johnston. Emanuel reminded Johnston that he previously had indicated that he had information about the crimes, and he told Johnston that they had " 'hit the wall.' " Johnston then referred to Montonye's earlier letter regarding her intention to subpoena him, and Montonye asked Johnston what he would say if he were subpoenaed. Johnston said, " 'I did it, I did it, I did the crimes.' " Emanuel asked him if he had committed the crimes alone, and he said, " 'Yes.' " Emanuel asked him if the petitioner had been there, and Johnston said, " 'No.' " Montonye asked Johnston if he were willing to put something in writing, and he answered in the affirmative. When Johnston asked what he should write, Emanuel told him to write whatever he wanted to write. Johnston said that he would put in the writing one detail that was not known. Johnston then made a written statement, which Emanuel and Montonye had notarized. Johnston also drew a map of the crime scene. The previously unknown "detail" to which Johnston referred was his claim, reflected in the written statement, that he had stolen the handcuffs from an apartment in Norfolk.

The habeas court specifically found that Johnston made these admissions spontaneously, without tutoring by either Emanuel or Montonye, that neither made any suggestions to Johnston about the contents of his statement before he made it, and that neither fed Johnston any information to " 'parrot' " at the habeas hearing. The habeas court also found, after reviewing the correspondence between Emanuel and Johnston, that there were no threats intended to induce Johnston to fabricate, that there was no evidence that Emanuel ever suggested to Johnston that he lie or otherwise participate in any deception concerning the assaults, and that there was no evidence that Emanuel's efforts caused Johnston to state any inaccuracies.

The fifth category of statements of Johnston involved his testimony in the habeas proceedings. Before being brought to Connecticut to testify, Johnston was brought before a New York court, where he was placed under oath and invited to testify about his involvement in the Clapboard Ridge assaults. After first asserting and then waiving his fifth amendment testimonial privilege, Johnston testified that he had assaulted the two teenagers on Clapboard Ridge on August 20, 1981. The habeas court found that this testimony, although less detailed than his subsequent habeas testimony, was not materially different from it.

In his habeas testimony, Johnston gave the following detailed account of his assault on the two teenagers on the night in question. During the summer of 1981, Johnston was living in Norfolk on interstate parole from New York following his release on a sentence for a conviction for assault. On numerous occasions in 1980 and 1981, he traveled from Virginia to New York and Connecticut in order to commit crimes for money. At that time, he had family in the Danbury area, including a brother in Southbury, and a sister and brother, who

was retired from the Danbury police department, in Danbury.

On August 20, 1981, he drove to the area from Virginia. From Brewster he drove to Danbury, and from his car he saw the two teenagers leaving a convenience store. After watching the pair through his rear view mirror, he parked his car on a side street near a real estate building. He then left his car, and walked back down the hill on Clapboard Ridge, passing the two teenagers who were going up the ridge. He watched them enter the woods while he continued up the hill, near a church on the right. He then looked around and noted the two teenagers walking toward the back of the church parking lot. Johnston was wearing blue dungarees, a short blue sweatshirt and work boots. He also was wearing a blue and white bandanna,[14] and he had a pellet gun and a pair of military handcuffs, which he had stolen from the East Ocean View Avenue apartments where he was then living.

Johnston then approached the two victims and told them that they were under arrest. While pointing the gun at William, Johnston told him to lie on the ground, which William did.[15] Johnston then put the handcuffs on William's wrists behind his back. William then got to his knees, and Johnston picked him up by the handcuffs and walked down the hill with both the victims, trying to stay in the wooded area where they would not be seen. Johnston then set William off to his left side and Elizabeth to his right. The two victims then

[14] Johnston identified the bandanna that had been an exhibit at the criminal trial as the bandanna he wore during the assaults. He also testified that it was new when he used it in August, 1981, and that it now had holes and pen marks on it. The habeas court specifically found that this testimony of Johnston supported his identification of the bandanna, because the criminal trial transcript indicated that the bandanna had been subjected to numerous scientific tests that had caused some deterioration of it.

[15] During his testimony, Johnston pointed out on a sketch of the area various places where these events took place.

told him they had no money and asked him what he wanted. Johnston then grabbed Elizabeth's breast with his left hand and stated, " 'I want some of this,' " and she stated that she would rather die first.[16] Johnston then pointed the pistol at William's head, told him not to move, and removed his belt and wrapped it around his feet. Johnston then had vaginal, anal and oral intercourse with Elizabeth, while she was fully conscious. After having sex with her, he began to pistol whip her and to strike her with his fists, hands and feet. As he was pistol whipping her with the pellet gun, holding it by the barrel, the bottom of it popped out. He took a shirt and wrapped it around her face as he was beating her.

At one point, Johnston left Elizabeth and returned to William, putting the belt around his neck and pulling him off the ground by the belt in an effort to choke him. Johnston then returned to Elizabeth and continued to beat her. During the assault on the two victims, he left them briefly and went back up the hill to snort cocaine. Johnston then returned to Elizabeth and beat her again. She stated something to the effect of, " 'Mister, would you please kill me,' " and when he asked her why, she said, " 'I can't take this anymore.' " At that point, he looked at her, and she had a jacket or pants around her face and was covered with blood.

As Johnston prepared to leave, he opened Elizabeth's pocketbook and emptied its content on the ground in order to make it look like a robbery. He recalled seeing a tampon, some change, house keys, and cigarettes and a lighter or matches. He then left through the woods

---

[16] Johnston also testified that, after he grabbed her breast, Elizabeth stated something to the effect of "not up here, down further, I don't want him to see this," that he told her to go further down the hill and take her clothes off, that she did so, and that she participated willingly in the sexual intercourse. As noted previously, the habeas court specifically did not credit this aspect of Johnston's testimony.

and returned to the road, walking on the left side, and he noticed in the lights of passing cars that his clothes and shoes were covered with blood. He then moved to the right side of the road so that car lights would not shine on him, proceeded down the hill to his car, and drove on Interstate 84 to Brewster.

As he entered the ramp to Interstate 84, Johnston threw the pellet gun out of the car window. He left the highway at a service area where there was a building behind an information center, and he removed his clothes and put on other clothes. He then drove to the Mill Plain Road exit, and as he passed the New York state line on Route 6 heading toward Brewster, he got out of the car and tossed his clothes away. He then drove toward Westchester County, and stopped at a McDonalds in Bedford Hills, New York, where he called the New York state police in Brewster. He called 279-6162,[17] and told the responding state trooper that he had just left two people behind a church on Clapboard Ridge. Johnston then drove back to Norfolk.

The habeas court specifically found that Johnston testified under a belief that "he was exposed to a substantial period of incarceration for these crimes," and that this belief was "probative on the issue of his credibility." The court based this on three factors. The first was the fact that Johnston's court-appointed counsel had assured the court that Johnston had been fully advised of his constitutional rights prior to his testi-

---

[17] At the habeas hearing, Johnston testified that he had specifically dialed the state police department's 279-6162 number, and not the 279-6161 number, which he knew the state police in Brewster also maintained, because he knew that the former number was less likely to be busy. At the original criminal trial, however, there had been testimony from an officer of the New York state police that an anonymous caller had called the 279-6161 line claiming to have just killed two people on Clapboard Ridge in Danbury. Despite this discrepancy, the habeas court found the existence of the anonymous telephone call to be probative of Johnston's guilt. See part I B 2 d of this opinion.

mony. The second was the court's own questioning of Johnston during his inculpatory testimony, which revealed Johnston's "conscious awareness of the possibility that he could still, under certain circumstances, be prosecuted for these crimes." The third was Emanuel's testimony that it was after Johnston had written and signed his statement on July 19, 1995, that Johnston asked Emanuel about the statute of limitations, and that Emanuel had told him that the statute of limitations had not run and that he was exposed to a substantial period of incarceration for the assaults. The habeas court, although not deciding whether Johnston could in fact be prosecuted for the assaults, specifically determined that his "perception of jeopardy, whether realistic or not, is probative on the issue of his credibility." In this regard, moreover, the court also specifically determined, based on testimony from Johnston's present prison guidance counselor, that Johnston's testimony could "expose him to the risk of elongated incarceration in New York," because it could deny him parole at his earliest possible parole date. Thus, the court deemed relevant to Johnston's credibility his "perception of his risk of further incarceration, either by way of prosecution for these crimes, or by denial of parole resulting from his admitted commission of these crimes."

The habeas court also addressed the respondent's claim, attacking Johnston's credibility, that "much of what Johnston stated could have been read in the Danbury News Times." Although acknowledging that this was correct because the case had been widely covered and Johnston not only had access to the newspapers at the time but testified that he had followed it in the newspapers and saw television reports about it, the court nonetheless found that this did not explain the discrepancies between Johnston's testimony regarding

the details of the assaults and the media accounts.[18] The habeas court stated: "Aside from the discrepancy concerning the sexual assault, the court ascribes the variances between Johnston's account and the victims' as attributable to the passage of time since the assaults, the respective opportunities the victims and Johnston had for observation, allowing for the time of day of the assaults, while also allowing for Johnston's felonious exertions and the possibility of erroneous recollection by both him and the victims. Indeed, the court would have been more gravely concerned about Johnston's veracity had every detail he recited been a mirror of media reports." Nonetheless, the habeas court acknowledged that "if the petitioner's case consisted of no more than Johnston's unvarnished claims, his credibility alone, without the external corroboration presented during the habeas hearing, would not entitle [the petitioner] to relief."[19]

c

### Identification Evidence

The habeas court recognized that Elizabeth's identification of the petitioner as her assailant was the heart

---

[18] Thus, the habeas court reasoned that "if Johnston were, indeed, 'parroting,' he could have claimed that he recalled the presence of the swing set instead of testifying that he did not remember seeing one. He could have claimed that the female victim was wearing green jeans, as reported in the newspaper, instead of testifying that she had on blue jeans. He could have stated that his blue shirt had dark ribbing about the sleeves and neck as reported in the newspaper, and that his shirt was a tee shirt, rather than a short sweat shirt, as he testified. These factors, together with the newspaper accounts that the female victim's clothing appeared to have been torn from her body, that her bra was in pieces, that her green dungarees were bloody, and that her blouse was torn, and her clothes strewn about, belie the claim that Johnston is merely echoing what he read or was told."

[19] The habeas court also addressed and specifically rejected Johnston's purported religious conversion as a credible motivation for his testimony. The court stated that it was "unimpressed with his claim that his newfound religious fervor has caused him to admit this crime while he maintains his innocence of a murder for which he has been convicted. For the court,

of the state's case in the criminal trial. The court reviewed the various identifications by the victims during the course of the police investigation, and also considered identification evidence offered in the habeas hearing.[20] On the basis of all of this evidence, the court found that, although the petitioner and Johnston do not actually look alike when seen in person, reasonably contemporaneous photographs of the petitioner and Johnston around the time of the assault show that they were similar in race, height, weight and receding hairline, and that Johnston more closely fits the descriptions of the assailant given by the victims before the petitioner's photograph was selected.

The habeas court also noted that, although at the criminal trial the victims' descriptions of the assailant were essentially consistent with each other, the habeas evidence disclosed that the victims' first descriptions were different in numerous respects from each other and from their later descriptions.[21] The court determined that certain of these differences in age, weight or build, and hair color and style "take on significance when compared and contrasted with Johnston's and [the petitioner's] physical characteristics."

The habeas court first noted a similar physical characteristic shared by both Johnston and the petitioner,

there are some facets of Johnston's life, including his provocations, that are beyond the ken of this mundane fact finder."

[20] In this regard, the habeas court specifically disavowed second-guessing the original trial jury based on the evidence presented to it, and did not question the conclusions of this court concerning the identification procedures presented to us. The habeas court did take into consideration, however, Johnston's physical characteristics as they correspond to the victims' descriptions of the assailant "as pertinent to the [petitioner's] claim of factual innocence."

[21] Thus, the habeas court noted that, according to a police report of one of the Danbury police officers who spoke with both victims at the emergency room, Elizabeth described the assailant as fat, with blond hair, and wearing a red bandanna and a plaid flannel shirt. William is noted in the same report as describing the assailant as in his late twenties, approximately five feet,

namely, that they were both five feet, eleven inches tall. With respect to age, the court noted that, at the time of the assaults, the petitioner was thirty-six years old and Johnston was thirty, thus nearer in age to William's original estimate of the assailant as being in his twenties.

With respect to build, the habeas court noted that Johnston's record of admission to Chesapeake Hospital shortly after the assaults described him as stout, well developed and well nourished, and that other records indicated his weight to have been approximately 215 pounds, which was consistent with the description by the victims of the assailant as fat or husky. In this connection, the court noted that, although at trial the petitioner weighed 220 pounds, there was also evidence that he had gained approximately forty pounds between the summer of 1981 and the time of trial, and that this evidence had been corroborated by photographs taken of him in July, 1981, in which he appeared much thinner than his appearance at the time of trial.

With respect to hair color and style, the habeas court noted that Johnston's hair was sandy brown at the habeas hearing, was described as brown or blond in various criminal justice reports, and in all of his pictures as well as his appearance at the hearing his hair is combed back. This was consistent with Elizabeth's testimony at the criminal trial acknowledging her September 4, 1981 written statement describing the assailant as having brown, slightly wavy hair combed back. The habeas court determined that color photographs of the petitioner show his hair to have been dark brown or black,[22] and that photographs purportedly taken in July,

nine inches tall, husky, with medium length wavy dark hair, wearing a light blue tee shirt with dark blue trim, and carrying an automatic type pistol.

[22] The habeas court acknowledged the conflicting evidence on this point. At the criminal trial, the state presented a witness who testified that, in 1981, the petitioner's hair was " 'reddish brown or reddish blond,' " and that

1981, show his hair to be neither wavy nor combed back, although he, like Johnston, had a receding hairline.

The habeas court also took note of a composite police sketch of the assailant that had been published in the Danbury News Times on August 30, 1981, showing a fleshy faced man with a broad nose and thick lips. There had been testimony at the criminal trial that the composite police sketch had been based on information given by William regarding the assailant's face from the bridge of the nose up, and the rest of the sketch was based on a composite that Carvahlo had made. The court noted that, although neither victim described the assailant as having a broad nose and thick lips; the composite and their accompanying newspaper accounts describe the assailant accordingly, and that those terms match Johnston's, but not the petitioner's, appearance.

Furthermore, the habeas court specifically credited both Johnston's testimony that he is right-handed and the petitioner's testimony that he is left-handed. The court found that this evidence, viewed in the light of certain evidence at the criminal trial, which the habeas court found "supports a belief that the assailant was right-handed . . . points more to Johnston than to [the petitioner]."[23]

The habeas court specifically noted Elizabeth's reassertion in the habeas hearing of her identification of

both the petitioner and his wife testified that he had never artificially colored his hair.

[23] The criminal trial evidence was the testimony of both William and Elizabeth. William had testified that when he first saw the assailant, he was holding the gun in his right hand, and that after the assailant forced William to the ground, the assailant switched the gun to his left hand, grabbed Elizabeth with his right hand, and took her down the hill. Elizabeth had testified that the assailant handcuffed William with his right hand while holding the gun awkwardly in his left hand.

the petitioner as her assailant, and found that it was based on her sincere belief. There were, however, in the view of the habeas court, additional facts not elicited at the criminal trial that "[tend] to erode confidence in [her] initial and continuing identification of [the petitioner] as her assailant." These facts were that, although the Danbury police at all times relevant to the assaults had two photographs of Johnston, although Johnston's name had come up early in the investigation as a suspect, and although as soon as the petitioner was arrested he brought Johnston's name to the attention of the police, no photograph of Johnston was shown to either victim until one was shown by Flanagan to Elizabeth in November, 1983, after the petitioner had been arrested. The habeas court specifically found that, at that time, Flanagan erroneously believed, based on misinformation given to him by Carvahlo, that Elizabeth had already been shown a photograph of Johnston. Flanagan showed Elizabeth the photograph and asked her if she had ever seen the person before. Elizabeth said no. The court determined that, since by that late date Elizabeth had already made an identification of the petitioner, "it was unlikely that she would make a different one." In this regard, the habeas court noted the conventional wisdom, reflected in our identification jurisprudence, that once a witness has made an identification it may be unlikely that he or she will subsequently retract it.[24]

d

## Circumstantial Evidence

The habeas court specifically credited "substantial circumstantial evidence to corroborate Johnston's testi-

---

[24] Indeed, it is just that risk—that an initial misidentification will harden into unretractable testimony—that underlies the constitutional requirements for fairness in the initial identification procedures employed by the police. See, e.g., *State* v. *Smith*, 200 Conn. 465, 469–70, 512 A.2d 189 (1986).

mony." First, at the time of the assaults, Johnston was familiar with the area where the crime occurred, having lived less than one mile away, having a grandparent who lived approximately one and one-half miles away, and having other family living in the area, namely, a brother on the Danbury police department, and a wife and child living with his sister in Danbury. In addition, the body of Johnston's subsequent murder victim was found approximately one mile from the scene of the Clapboard Ridge assaults.

Second, in the summer of 1981, Johnston's life was in disarray. Late that summer and during that fall, he left his residence and employment without permission of the Virginia parole authorities. On February 17, 1982, the sheriff's department in Duchess County, New York, arrested him for violation of parole.

Third, he was in the area of the crimes when they were committed. His Chesapeake Hospital admission report of August 24, 1981, indicated that he had been in the New York area a few days earlier.

Fourth, by the time of these assaults, Johnston had amassed a substantial criminal record of violent, assaultive behavior directed mainly against women, and had been identified as a sexual deviant. His record included a 1970 arrest in Danbury for assault with intent to commit rape, a 1972 conviction for attempted robbery that, according to his parole report, had "sexual connotations," a 1979 conviction for beating a woman and stealing her pocketbook, and a 1979 psychiatric report indicating that he had threatened a woman with whom he had had forced sexual contact and containing a notation that his offenses " 'indicate sexual deviancy.' " In addition, by the time of the habeas hearing he had been convicted of the murder of a woman, whom he had strangled and whose breast he had bitten.[25]

[25] In this connection, however, the habeas court specifically did not credit certain evidence of uncharged criminal conduct by Johnston offered by

Fifth, Johnston had a propensity to communicate with the police regarding crimes that he had committed, which the habeas court found relevant in light of the fact that in the Clapboard Ridge assaults, someone had made a call to the state police substation in Brewster indicating that he had just left two people for dead in back of the church on Clapboard Ridge Road. There was evidence that Johnston had a history of making telephone calls to the police to discuss crimes. In the murder for which he was convicted, prior to his arrest Johnston had called the Putnam County sheriff's department, and he even appeared once there to tell the police that he wanted to talk with them and help with the investigation. The habeas court also specifically found this conduct to be similar to Johnston's visits to the petitioner's residence with claims of special knowledge and offers of assistance.

Finally, Johnston and the petitioner knew each other. Before being employed as a federal correction officer, the petitioner had worked as an officer in the Putnam County sheriff's department, where he had had contact with Johnston and, on one occasion, had transported him to prison. On another occasion, Johnston had threatened the petitioner and his family, prompting Sheriff Grenier to place guards at the petitioner's home. Johnston testified that he had not liked the petitioner and was initially pleased that the petitioner had been arrested. The habeas court specifically did not credit this testimony as probative of Johnston's culpability, but did credit it as probative of why he failed to come forward earlier. The habeas court specifically found

the petitioner to show Johnston's modus operandi as "signature crimes" sufficiently similar to the Clapboard Ridge assaults. This evidence consisted of certain telephone calls relating to a shooting in Bedford, New York, which police officials believed Johnston had made, and several "lovers lane" crimes that the police believed Johnston to have committed. The habeas court rejected this evidence because it did not sufficiently establish that Johnston had committed the uncharged crimes.

that Johnston's early antipathy for the petitioner and for authority in general "was well established at the habeas hearing."

3

The Habeas Findings and Orders

The habeas court specifically found that the petitioner had proven that he is factually[26] innocent of the assaults that occurred on August 20, 1981, on Clapboard Ridge in Danbury. The court specifically noted its reliance in making this finding on the trial testimony and exhibits, as well as the following habeas evidence: the evidence regarding the gun; the medical evidence relating to both Elizabeth and Johnston, including their hospital records; Johnston's in-court testimony and his various statements about the case over the years; the evidence that the victims did not see Johnston's photograph prior to Elizabeth's identification of the petitioner, together with Johnston's substantial physical similarity to the descriptions by the victims of their assailant shortly after the crimes; Johnston's familiarity with the Danbury area and the specific crime scene; and his substantial record of violence toward women, leading to a summer in which his life was in disarray.

The habeas court concluded that the evidence pointing to Johnston's culpability, which together with the criminal trial evidence led it to its finding of actual innocence, was newly discovered, and could not have been discovered by the petitioner earlier with due diligence. The court also specifically found that the petitioner had proven his factual innocence by clear and convincing evidence, that this was a truly persuasive demonstration of actual innocence, and that the petitioner's evidence that Johnston, and not the petitioner,

---

[26] We note that "factual" and "actual" innocence have the same meaning and are used interchangeably in this opinion.

committed the assaults points unerringly to the petition-
er's innocence. The court also was convinced that the
petitioner's evidence "has so undercut the vitality of his
underlying conviction that it is left with no substantial
indicia of reliability." Finally, the habeas court con-
cluded that, taking all of the evidence into account, no
reasonable fact finder *would* find the petitioner guilty.[27]
Accordingly, the habeas court granted the petitioner's
petition for a new trial, and ordered the petitioner dis-
charged unless the state's attorney, within thirty days
of the court's decision, filed a written notice of his
intention to proceed with a retrial of the petitioner.

II

The respondent claims that the judgment of the
habeas court must be reversed because the court
employed an improper standard for evaluating the peti-
tioner's freestanding claim of actual innocence.[28] More
specifically, the respondent proposes the following
three-pronged test for evaluation of a freestanding claim
of actual innocence based on new evidence: (1) the
new evidence must contain strong objective indicia of
reliability; (2) considering this new evidence in light of
the evidence as a whole, the record must demonstrate
clearly and convincingly that the petitioner did not com-
mit the criminal act for which he was convicted; and
(3) the new evidence must be such that if it were cred-

---

[27] In this respect, the habeas court specifically eschewed an inquiry into
whether a reasonable fact finder *could* find the petitioner guilty.

[28] We emphasize, as did the habeas court and as the parties do as well,
that the petitioner's claim of actual innocence is "freestanding." This means,
as explained in *Summerville* v. *Warden*, supra, 229 Conn. 422, that there is
no claim of an antecedent constitutional violation that affected the result
of his criminal trial. Such a freestanding claim is to be contrasted with what
has come to be known in federal habeas jurisprudence as a "gateway" claim
of actual innocence. Such a claim serves as a gateway to permit federal
habeas review of an otherwise procedurally barred state conviction that the
petitioner asserts is constitutionally flawed. See, e.g., *Schlup* v. *Delo*, 513
U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).

ited, no reasonable person *could* find that the petitioner committed that criminal act. The respondent also claims that, gauged by this standard or by any appropriate standard, the petitioner's claim of actual innocence must fail. In addition, the respondent also proposes that the determination of a habeas court that a petitioner is actually innocent must be subject to independent, de novo review by an appellate court.

The petitioner urges us to adopt the standard employed by the habeas court, which he views as composed of two components. The first component is that the petitioner's actual innocence must be established by clear and convincing evidence. The second component is that, if presented with all of the evidence, both that adduced at the original criminal trial and that adduced in the habeas hearing, no reasonable fact finder *would* find the petitioner guilty of the crime. In addition, the petitioner claims that, at least with respect to the underlying historical facts as found by the habeas court, an appellate court should review those facts under its traditional " 'clearly erroneous' " scope of review. The petitioner claims that, gauged by these standards, he has met his burden.

A

The Standard of Proof

We first consider the standard of proof that a habeas corpus petitioner must meet in order to prevail on a freestanding claim of actual innocence.[29] In *Sum-*

[29] In doing so, we assume without deciding that the petitioner's claim must be based on "new evidence," that is, evidence that is not cumulative, was not available to the petitioner at his criminal trial, and could not have been discovered by him at that time through due diligence. See *Summerville* v. *Warden*, supra, 229 Conn. 426. We make this assumption for the purposes of the present case because: (1) the habeas court applied that requirement to the petitioner in this case, and determined that the petitioner's evidence met that requirement; (2) the petitioner agreed that this should be one of the components of his burden; and (3) the parties do not dispute that the

*merville,* we rejected, as insufficiently demanding and as inconsistent with our habeas jurisprudence, the standard of proof applicable to a petition for a new trial based on newly discovered evidence, namely, "a *probability* of a different result" in the new trial at which both the original and the new evidence would be presented. (Emphasis in original.) *Summerville* v. *Warden,* supra, 229 Conn. 431. We also surveyed, without choosing because it was unnecessary in that case, the more demanding standards of proof that had been articulated by the various jurisdictions that had theretofore "wrestled with [the] problem" of what standard to apply in this context. Id., 433.

Thus, in *Herrera* v. *Collins,* 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993), a majority of the United States Supreme Court would have required, based on both the newly discovered and original evidence, "*a truly persuasive demonstration of 'actual innocence'*"; (emphasis added) id., 417; with an "*extraordinarily high*" threshold of entitlement to federal habeas relief. (Emphasis added.) Id. Justices O'Connor and Kennedy, in a concurring opinion, would have required "extraordinarily high and truly persuasive demonstration[s] of actual innocence." (Internal quotation marks omitted.) Id., 426. In his concurring opinion, Justice White would have required the petitioner to establish that " 'no rational trier of fact *could* [find] proof of guilt beyond a reasonable doubt.' " (Emphasis added.) Id., 429. In *In re Clark,* 5 Cal. 4th 750, 766, 855 P.2d 729, 21 Cal. Rptr. 2d 509 (1993), the California Supreme Court required that the newly discovered evidence, if credited, must

petitioner's evidence *is* newly discovered. We recently certified for appeal the specific question of whether a freestanding claim of actual innocence must be based on new evidence. *Williams* v *Commissioner of Correction,* 240 Conn. 547, 548, 692 A.2d 1231 (1997). We subsequently dismissed that certified appeal as having been improvidently granted, however, because the petitioner in that case also agreed with the "new evidence" requirement. Id., 548–49.

cast "fundamental doubt on the accuracy and reliability of the proceedings . . . [and] must undermine the entire prosecution case and point unerringly to innocence . . . ."[30] (Internal quotation marks omitted.) In surveying these standards, moreover, we did not "preclude the possibility of another appropriate standard to such a claim . . . [namely] that a habeas corpus petitioner is required to establish his actual innocence by clear and convincing evidence, a standard higher than a probability but lower than beyond a reasonable doubt . . . ." *Summerville* v. *Warden*, supra, 229 Conn. 436–37 n.22.

In consideration of a proper balance of the interests at stake in the evaluation of a freestanding claim of actual innocence, of the well established jurisprudence regarding the functions of an appropriate burden of proof for a particular category of case, and of the remedy that would follow from a determination in a habeas proceeding of actual innocence, we conclude that the most appropriate standard of proof is as follows. First, taking into account both the evidence produced in the original criminal trial and the evidence produced in the habeas hearing, the petitioner must persuade the habeas court by clear and convincing evidence, as that standard is properly understood and applied in the context of such a claim, that the petitioner is actually innocent of the crime of which he stands convicted. Second, the petitioner must establish that, after considering all of that evidence and the inferences drawn therefrom,

---

[30] Since our decision in *Summerville*, at least two other courts have articulated a standard of proof more demanding than that of a probability of a different result on a retrial. See *Carriger* v. *Stewart*, 95 F.3d 755, 757 (9th Cir. 1996) ("petitioner seeking to prove actual innocence under *Herrera* must do so by clear and convincing proof"), reh. granted, 106 F.3d 1415 (9th Cir. 1997); *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996) ("petitioner must show by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence").

as the habeas court did, no reasonable fact finder would find the petitioner guilty.

We begin our analysis by recounting the interests at stake. In *Summerville* v. *Warden*, supra, 229 Conn. 423, we identified those interests in terms of risk. "The standard must strike an appropriate balance between, on one hand, the risk that an actually innocent person may be incarcerated, despite his conviction after a fair trial, and, on the other hand, the risk that an actually guilty person, fairly convicted, may nonetheless be set free years later, principally because of the effect of the passage of time on the state's evidence and on the reliability of the fact-finding process." Id.

Thus, the petitioner's interest is in establishing that, although convicted in a fair trial upon the evidence then available, he is nonetheless actually innocent and that, therefore, it is simply unjust to continue his status as a convicted person. This interest is not, however, solely that of the petitioner, because it is shared in some measure by the state. The state's share of that interest is expressed in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship*, 397 U.S. 358, 372, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring).

The state's particular interest, however, is in maintaining the fairly obtained conviction of one whom it sincerely believes *is* guilty, and in not being required to maintain that status by way of a second trial years later, when its evidence of guilt may be less reliable and persuasive than it was when it was fresh. Indeed, we have recognized "the fact that in many cases an order for a new trial may in reality reward the accused with complete freedom from prosecution because of the debilitating effect of the passage of time on the state's evidence." *Summerville* v. *Warden*, supra, 229

Conn. 427. Buttressing this particular interest are the more general "interests . . . in preserving the finality of judgments, [and] in not degrading the properly prominent place given to the original trial as the forum for deciding the question of guilt or innocence within the limits of human fallibility . . . ." Id.

The functions of a burden of proof are twofold: (1) it allocates the risk of error between the litigants; and (2) it indicates the relative importance of the ultimate decision. *State* v. *Davis*, 229 Conn. 285, 293, 641 A.2d 370 (1994). Both of these functions "reflect a very fundamental assessment of the comparative social costs of erroneous factual determinations." *In re Winship*, supra, 397 U.S. 370 (Harlan, J., concurring).

With respect to the first function, namely, the allocation of the risk of error, "the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect the comparative social disutility" of an erroneous outcome in that litigation. Id., 371. Thus, the greater the social cost of an erroneous outcome in a particular type of litigation, the higher the standard of proof the law applies to that litigation. With respect to the second—and intimately related—function, namely, the indication of the relative importance of the ultimate decision, the "standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of the factual conclusions for a particular type of adjudication." Id., 370. Thus, the more confidence our society requires in the correctness of factual determinations for a particular type of litigation, the higher the standard of proof the law applies to that litigation.

Moreover, inextricably linked to the relevant interests of the litigants and to the functions of the burden of proof is the remedy that necessarily follows the suc-

cessful assertion of a habeas corpus claim of actual innocence. That remedy is not the outright release of the petitioner. It is, instead, "a new trial at which his guilt or innocence will again be determined." *Summerville* v. *Warden*, supra, 229 Conn. 432.

Applying these three factors—the balancing of the relevant interests of the petitioner and the state, the functions of a burden of proof, and the remedy in the event of a successful petition—we conclude that, in order to grant a petitioner's request for relief, the habeas court first must be convinced by clear and convincing evidence that the petitioner is actually innocent. The clear and convincing standard of proof is substantially greater than the usual civil standard of a preponderance of the evidence, but less than the highest legal standard of proof beyond a reasonable doubt. It "is sustained if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are *highly probably*[31] true, that the probability that they are true or exist is *substantially greater* than the probability that they are false or do not exist." (Emphasis added; internal quotation marks omitted.) *State* v. *Bonello*, 210 Conn. 51, 66, 554 A.2d 277, cert. denied, 490 U.S. 1082, 109 S. Ct. 3268, 106 L. Ed. 2d 612 (1989).

Although we have characterized this standard of proof as a "middle tier standard"; *J. Frederick Scholes Agency* v. *Mitchell*, 191 Conn. 353, 358, 464 A.2d 795 (1983); and as "an intermediate standard"; *State* v. *Davis*, supra, 229 Conn. 293; between the ordinary civil standard of a preponderance of the evidence, or more

---

[31] It is unavoidable that in this type of case, as in almost every case involving a question of fact, "the factfinder cannot acquire unassailably accurate knowledge of what happened. Instead, all the factfinder can acquire is a belief of what *probably* happened. The intensity of this belief—the degree to which a factfinder is convinced that a given act occurred—can, of course, vary." (Emphasis in original.) *In re Winship*, supra, 397 U.S. 370 (Harlan, J., concurring).

probably than not, and the criminal standard of proof beyond a reasonable doubt, this characterization does not mean that the clear and convincing standard is necessarily to be understood as lying equidistant between the two. Its emphasis on the *high probability* and the *substantial greatness of the probability* of the truth of the facts asserted indicates that it is a very demanding standard and should be understood as such, particularly when applied to a habeas claim of actual innocence, where the stakes are so important for both the petitioner and the state. We have stated that the clear and convincing evidence standard "should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Internal quotation marks omitted.) *Lopinto* v. *Haines*, 185 Conn. 527, 539, 441 A.2d 151 (1981). Thus, we see no functional difference between this standard, properly understood, and the formulations in *Herrera* v. *Collins*, supra, 506 U.S. 390, of both the majority—"*a truly persuasive demonstration of 'actual innocence'*" (emphasis added) id., 420; and the concurring opinion of Justices O'Connor and Kennedy—"extraordinarily high and truly persuasive demonstration[s] of actual innocence." (Internal quotation marks omitted.) Id., 426. Indeed, in *Carriger* v. *Stewart*, 95 F.3d 755, 757 (9th Cir. 1996), the Court of Appeals equated the *Herrera* standard that the petitioner must " 'unquestionably establish [his] innocence' " with the clear and convincing evidence standard.

Moreover, we regard this standard as functionally equivalent to a significant part of the demanding standard imposed by the California Supreme Court in *In re Clark*, supra, 5 Cal. 4th 766. If a habeas petitioner has established by clear and convincing evidence that he is actually innocent—that is, if he has made a truly persuasive demonstration of actual innocence—then

necessarily he has cast "fundamental doubt on the accuracy of and reliability of the [criminal] proceedings." Id.[32] We agree, therefore, with the Texas Court of Criminal Appeals that, at least when applied to a habeas claim of actual innocence, the clear and convincing evidence standard requires "an exceedingly persuasive case that [the petitioner] is actually innocent." *Ex parte Elizondo*, 947 S.W.2d 202, 206 (Tex. Crim. App. 1996).

Consistent with the heavy burden that this standard of proof imposes, courts and legislatures have employed it in constitutional, legislative and common-law contexts involving extremely significant questions of fact. In *Cruzan* v. *Director, Missouri Dept. of Health*, 497 U.S. 261, 284, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990), the United States Supreme Court held that it was constitutionally permissible for Missouri to require clear and convincing evidence that a terminally ill person in a vegetative state would have wanted the termination of life support systems. Similarly, we have held that, in order for the state to prove a compelling need for excluding a criminal defendant from the witness room during the videotaping of a minor victim's testimony, the state must show by clear and convincing evidence that the defendant's presence would seriously impair the victim's trustworthiness. *State* v. *Jarzbek*, 204 Conn. 683, 704–705, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988); see also General Statutes § 54-86g (codifying *Jarzbek* requirements); *United States* v. *Wade*, 388 U.S. 218, 240, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967) (application of clear and convincing standard to questions of

---

[32] As we explain later in this opinion, the second component of the standard that we adopt in this case is consistent with the remainder of the test adopted by the California Supreme Court in *In re Clark*, supra, 5 Cal. 4th 766. "At the guilt phase, such evidence, if credited, must undermine the entire prosecution case and point unerringly to innocence . . . ." (Internal quotation marks omitted.) Id.

admissibility involving constitutional requirements going to reliability of evidence); *United States* v. *Thevis*, 665 F.2d 616, 631 (5th Cir.), cert. denied sub nom. *Evans* v. *United States*, 456 U.S. 1008, 102 S. Ct. 2300, 73 L. Ed. 2d 1303 (1982) (same); *Rego* v. *Connecticut Ins. Placement Facility*, 219 Conn. 339, 343, 593 A.2d 491 (1991) (proof of common-law fraud); *Lopinto* v. *Haines*, supra, 185 Conn. 533 (reformation of instrument based on unilateral mistake and inequitable conduct); *Dacey* v. *Connecticut Bar Assn.*, 170 Conn. 520, 536, 368 A.2d 125 (1976) (whether defamatory falsehood made with knowledge of falsity or reckless disregard of truth). The application of the clear and convincing evidence standard to freestanding claims of actual innocence is consistent with this body of jurisprudence.

Having identified what we believe to be the proper contours and weight of the clear and convincing evidence standard, we now explain why the balancing of the relevant interests, the nature of a burden of proof and the remedy involved in this case lead us to conclude that this standard is the most appropriate for a habeas claim of actual innocence. First, both sets of interests—those of the petitioner and those of the state—are very weighty and command respect. Indeed, if all we had available upon which to formulate an appropriate standard of proof were the balancing of these interests, we would be hard put to do so, because they are so evenly weighted. After due consideration, however, we think that, because of society's fundamental determination that it is far worse to convict an innocent person than to acquit a guilty one, the scale tips in favor of the petitioner's interest and, therefore, in erecting a standard of proof that will permit the vindication of that value, while at the same time imposing a standard that appropriately recognizes the weighty interests of the state in the matter. The clear and convincing evi-

dence standard, we believe, meets both of those requirements.

Second, the functions of the burden of proof point in the same direction. Regarding the relative risks of error, we note that if the habeas court improperly *rejects* the petitioner's claim—that is, if the petitioner is in fact innocent of the crime for which he stands convicted but the habeas court determines that he has not met the requisite standard of proof—the outcome is that an innocent person remains convicted and, in this case, subject to incarceration for a very lengthy period of his life. If, however, the habeas court improperly *grants* the petitioner's claim—that is, if the petitioner is in fact guilty of the crime for which he stands convicted but the habeas court determines that he has met the requisite standard of proof—the outcome is that a guilty person is ordered released, but the state may retry him. We conclude that the clear and convincing standard of proof appropriately balances these competing considerations, thus giving the petitioner the benefit of any error, but in such a way that the state's potential difficulties of proof on such a retrial are given reasonable significance.

Regarding the importance of the ultimate decision, we note that the clear and convincing standard instructs the habeas fact finder that it must be convinced of the petitioner's actual innocence to a high degree of probability, a probability substantially greater than a preponderance of the evidence, and that it must find the petitioner's claim to be highly and truly persuasive. This is, we believe, an appropriate degree of confidence for the fact finder to have before taking the extraordinary step of overturning a fairly obtained conviction on the basis of the petitioner's actual innocence.

Third, the remedy that follows such a determination serves as a check on the risk of error unduly favoring

the petitioner. That remedy is, as we have said, not the outright release of the petitioner but a retrial. Thus, if the state is still convinced that the petitioner is guilty, despite the finding of the habeas court, it has the option of retrying the petitioner and attempting to persuade a second jury of that guilt beyond a reasonable doubt, based on all of the evidence now available to both parties. This factor also favors erecting a standard of proof that presents a very demanding but not unsurmountable hurdle for a claim of actual innocence while, at the same time, leaving sufficient flexibility by which the state can then make its legitimate procedural choices. The clear and convincing evidence standard does so.

In addition, this standard has the virtue of jurisprudential familiarity. Unlike the other new standards that have been offered, and to the extent that those standards differ from the clear and convincing evidence standard, this standard has a readily ascertainable, although perhaps not easily applied, meaning to trial courts. Thus, by employing it in this context we avoid injecting into a very difficult type of adjudication a new, undefined standard of proof that could be very subjective in its application. Wise judicial policy counsels that, in approaching this type of adjudication, it is better to use existing judicial tools, properly understood, than to fashion new ones that have no preexisting jurisprudence to inform their application.

We next address the second component of the standard of proof for a claim of actual innocence that the jurists and courts that have considered the question have included in one form or another. That component requires some determination by the habeas court of what a second fact finder—normally, a jury—is likely to do if presented with the same evidence, original and new, that was presented to the habeas court. That component has been expressed in various ways. Thus,

Justice White in his concurring opinion in *Herrera* v.
*Collins*, supra, 506 U.S. 429, would have required the
petitioner to establish that " 'no rational trier of fact
*could* [find] proof of guilt beyond a reasonable doubt.' "
(Emphasis added.) In *Ex parte Elizondo*, supra, 947
S.W.2d 209, the Texas Court of Criminal Appeals has
determined that "the petitioner must [establish] . . .
that no reasonable juror *would* have convicted him
in the light of the new evidence." (Emphasis added.)
Similarly, in the context of federal gateway claims of
actual innocence, the United States Supreme Court has
held that the petitioner must establish that "it is more
likely than not that no reasonable juror *would* have
convicted him in light of the new evidence." (Emphasis
added.) *Schlup* v. *Delo*, 513 U.S. 298, 327, 115 S. Ct. 851,
130 L. Ed. 2d 808 (1995). We conclude that the most
appropriate standard is whether no reasonable fact
finder, considering all of the evidence in the same way
that the habeas court considered it, and drawing the
same inferences that the habeas court drew, *would* find
the petitioner guilty of the crime of which he stands
convicted.[33] This formulation, moreover, is consistent
with the remedy of a new trial upon a successful habeas
petition, because on the new trial the fact finder would
be free to draw inferences contrary to those drawn by
the habeas court and thereby find the defendant guilty
beyond a reasonable doubt.

As an initial matter, we reject the requirement, urged
by the respondent in the present case, that the petitioner
establish that no reasonable fact finder *could* find him
guilty of the crime charged. Such a requirement is sim-
ply a restatement of the traditional scope of review of
the sufficiency of the evidence underlying a criminal

---

[33] We regard as unfounded the continuing "fear" of Justice Berdon that
the two part test we have articulated places " 'an impossibly high standard
on a petitioner' " seeking a new trial on the basis of actual innocence.
Witness this case.

conviction. Under this rubric, we consider the evidence, and all permissible inferences drawable therefrom, in a light favorable to upholding the jury's verdict of guilt, and ask whether any rational fact finder could have reached such a verdict. *State* v. *Montanez*, 219 Conn. 16, 19–20, 592 A.2d 149 (1991). Under this analysis, moreover, we do not evaluate or consider the contrary evidence, presuming in effect that the jury did not credit it. Thus, the practical effect of that standard in a case of a freestanding claim of actual innocence would be that no such claim would ever prevail because, presumably, the state would still have available the evidence on which the petitioner was originally convicted, and that evidence had already withstood the traditional sufficiency of evidence scope of review. See *Ex parte Elizondo*, supra, 947 S.W.2d 205 (under sufficiency of evidence standard, it is "theoretically impossible for any habeas applicant to sustain" claim of actual innocence).

We also reject the respondent's proposed requirement that the evidence establishing innocence contain "strong objective indicia of reliability . . . ." The respondent attempts by this requirement to cabin the particular type of evidence that must underlie the finding of innocence. This is simply unrealistic. As this case demonstrates, evidence and the inferences drawn from it come in all types, of varying degrees of persuasiveness and reliability, and a judicial fact finder must look at it all and apply all of his or her powers of intellect, common sense, judgment, reason, and knowledge of human nature in arriving at factual determinations. We do not ordinarily specify particular *types* of evidence that must support particular facts to be found, and we see no persuasive reason to do so in this case.

As we have stated, all of the courts and jurists that have addressed claims of actual innocence have imposed some component that focuses on the likely

effect on a jury or trial court of the evidence of actual innocence. We agree with the petitioner that the most appropriate standard is whether, based on all of the evidence presented to the habeas court, no reasonable fact finder *would* find the petitioner guilty. This standard, we believe, gives proper deference both to the antecedent finding of guilt by the jury in the criminal trial and to the finding of actual innocence by the habeas court. Like the burden of factual persuasion of clear and convincing evidence, and unlike the standard urged by the respondent, it erects a demanding but not insurmountable barrier that the petitioner must overcome in order to establish his claim of actual innocence.

Moreover, this standard is to be applied to the facts and inferences as found and drawn by the habeas court, because those facts and inferences are by definition the facts of the habeas case. Only the habeas court heard and considered *all* of the evidence, drew inferences therefrom and reached factual determinations. Short of finding facts ourselves—which we are not equipped to do—that is the only realistic and proper way to view a case such as this.

Furthermore, applying this second component in this fashion is consistent with our habeas jurisprudence regarding a petition for a new trial based on newly discovered evidence. In that context, in which "the primary test is whether an injustice was done . . . [we ask whether] on a new trial a different result would be reached." *Taborsky* v. *State*, 142 Conn. 619, 623, 116 A.2d 433 (1955). Thus, in that context, we focus on the likely effect of the newly discovered evidence on a second fact finder.

In addition, this application of the standard is consistent with the demanding standard articulated by the California Supreme Court in *In re Clark*, supra, 5 Cal. 4th 766. "At the guilt phase, such evidence [pointing

to actual innocence], *if credited*, must undermine the entire prosecution case and point unerringly to innocence . . . ." (Emphasis added; internal quotation marks omitted.) Id. Thus, as we read the California standard, where the exculpatory evidence is credited by the habeas court, that is the evidentiary basis for determining what a reasonable fact finder would find. In the present case, the habeas court *did credit* the essential portions of the petitioner's exculpatory evidence.

## B

### Our Scope of Review

As we have noted, the parties differ on the appropriate scope of review that we should apply to the findings of the habeas court. The respondent urges us to review the record de novo, and determine ourselves whether the evidence adduced establishes the petitioner's actual innocence. The petitioner urges us to apply the traditional scope of review to a trial court's factual determinations, namely, that they must stand unless they are clearly erroneous.

With respect to the first component of the petitioner's burden, namely, the factual finding of actual innocence by clear and convincing evidence, we conclude that neither scope of review is appropriate. The appropriate scope of review is whether, after an independent and scrupulous examination of the entire record, we are convinced that the finding of the habeas court that the petitioner is actually innocent is supported by substantial evidence. This is the same scope of review that we apply to the ultimate finding by a trial court regarding whether a confession in a criminal case is voluntary. See, e.g., *State* v. *Byrd*, 239 Conn. 405, 408, 685 A.2d 669 (1996). The weight of the interests at stake in the factual determination by the habeas court in the present case compels the same heightened level of scrutiny.

The state's proposal that we conduct de novo review of the habeas court's factual finding of actual innocence is inconsistent with what we have determined to be the essentially factual nature of the habeas court's task in making that determination. Indeed, this record demonstrates the difficulty of applying that scope of review with intellectual honesty. Many of the habeas court's factual determinations leading to what it described as the mosaic of Johnston's guilt were based on its assessment of the credibility of the particular witnesses, including Johnston himself, who testified in the habeas court. It would be impossible to parse those parts of the record that do, and those that do not, depend on these kinds of credibility determinations. Furthermore, the habeas court credited parts of some witnesses' testimony, including Johnston's, and did not credit other parts. It would be impossible honestly to apply de novo review to that process of factfinding. Moreover, by imposing the clear and convincing standard of proof, as we have elucidated it, we have put forth a sufficiently heavy burden for a petitioner to meet in a case such as this. It is not necessary to erect what is likely to be an artificial additional barrier to relief.

We also reject the petitioner's suggestion that we apply the traditional scope of review to the factual determination of actual innocence, namely, that such a determination must stand so long as it is not clearly erroneous. Although even this deferential scope of review leaves open the option of reversal if an appellate court is firmly convinced that, upon review of the entire record, a mistake has been made; *State* v. *Reagan*, 209 Conn. 1, 8–9, 546 A.2d 839 (1988); that scope of review does not afford sufficient weight to the importance of the factual determination at stake, to the interests of the parties, and to the extraordinary nature of the ultimate remedy in the event that the petitioner is successful.

Different considerations apply, however, to the second component of the petitioner's burden, namely, that no reasonable fact finder would find the petitioner guilty. With respect to that component, our scope of review is plenary. A habeas court is no better equipped than we are to make the probabilistic determination of whether, considering the evidence as the habeas court did, no reasonable fact finder would find the petitioner guilty. That type of determination does not depend on assessments of credibility of witnesses or of the inferences that are the most appropriate to be drawn from a body of evidence—assessments that are " 'quintessentially' [the] task for the [fact finder]" in a habeas proceeding. *O'Dell* v. *Netherland*, 95 F.3d 1214, 1250 (4th Cir. 1996). Determining whether no reasonable fact finder, considering the entire body of evidence as the habeas court did, would find the petitioner guilty is either an application of law to the facts or a mixed question of law and fact to which a plenary standard of review applies. See id.

Finally, although we recognize that the factual determination of actual innocence, if upheld, will ordinarily mean that this legal determination is upheld as well, it is possible in a given case that a habeas fact finder could determine that, based on the facts he or she finds, no reasonable juror would find the petitioner guilty, but an appellate court could nonetheless disagree with that determination. Also, in reviewing these determinations, an appellate court need not review the factual determination *before* reviewing the legal determination. Thus, it could focus on either prong of the test, and if it concludes that the second prong is not satisfied it could decline to review the first prong. Cf. *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

We add one final note to this discussion. As the United States Supreme Court has noted, truly persuasive demonstrations of actual innocence after conviction in a

fair trial have been, and are likely to remain, "extremely rare." *Schlup* v. *Delo,* supra, 513 U.S. 324. We are confident that our habeas judges will, as did the habeas court in the present case, carefully and conscientiously scrutinize the evidence supporting such claims and apply the appropriate standard of proof properly.

### III

Applying the clear and convincing evidence standard of proof to the entire record in this case, we conclude that the factual finding of the habeas court that the petitioner is actually innocent must stand. We have independently and scrupulously reviewed the entire record of this case—the original trial transcript and exhibits, and the transcript and exhibits of the habeas hearing—and we conclude that substantial evidence supports the finding by the habeas court that the petitioner has established by clear and convincing evidence that he is actually innocent of the crimes for which he stands convicted.

The habeas court carefully considered all of the evidence presented to it. In addition to the original criminal trial evidence, the habeas court based its ultimate factual finding on a mosaic of evidence that it found clearly and convincingly established the petitioner's innocence. That mosaic included the evidence regarding the pellet pistol, the medical evidence regarding both Elizabeth and Johnston, Johnston's in-court testimony and his numerous statements over the years, the identification process involving Johnston's photograph and his physical similarity to the initial descriptions of the assailant, Johnston's familiarity with the specific crime scene, and his substantial record of violence toward women. There was substantial evidence to support each piece of the mosaic. We acknowledge that, as the respondent emphasizes and as recounted previously, Johnston's testimony was not fully consistent with the

evidence presented at the original criminal trial or with the testimony of Elizabeth. Nonetheless, the habeas court carefully and thoroughly considered these inconsistencies before finding the petitioner factually innocent of the assaults in question. Under these circumstances, we conclude that the habeas court's ultimate finding was supported by substantial evidence in the record.

Furthermore, we conclude upon plenary review that no reasonable fact finder, if presented with the same evidence as was presented to the habeas court and drawing the same inferences from that evidence that the habeas court drew, would find the petitioner guilty of the crimes of which he stands convicted. On that supposition, any reasonable fact finder would conclude that, despite the inculpatory evidence produced in the criminal trial and reasserted in the habeas proceeding, it was Johnston and not the petitioner who committed the crimes of which the petitioner stands convicted. The habeas court's determination, therefore, must stand.

The judgment is affirmed.

In this opinion PALMER and PETERS, Js., concurred.

BERDON, J., concurring[1] and dissenting. This court does today what I feared it would do in *Summerville* v. *Warden*, 229 Conn. 397, 641 A.2d 1356 (1994)—that is, place "an impossibly high standard on a petitioner who seeks a new trial based on evidence that he or she is actually innocent of the crime." Id., 441 (*Berdon, J.,* dissenting).[2] Specifically, the court adopts a standard

[1] I agree with the majority's result, granting a writ of habeas corpus to the petitioner, Lawrence J. Miller. The evidence of his probable innocence is overwhelming. I disagree, however, that a petitioner must meet the standard set forth by the majority in order to be successful.

[2] In *Summerville* v. *Warden*, supra, 229 Conn. 436–37, the majority did not determine the standard because, in their opinion, they "conclude[d] that, under any one of them . . . [the] testimony was insufficient to trigger an evaluation of it by the habeas court for the purpose of determining

under the guise of the clear and convincing standard of proof that, in actuality, comes dangerously close to requiring the petitioner to establish his or her innocence beyond a reasonable doubt. Indeed, some of the abstruse language employed by the majority can be read to require the petitioner to prove that he is absolutely innocent before he is entitled to relief. Because this standard applies to all crimes, including those in which the death penalty has been prescribed, the majority would allow the state to execute a person even if he could demonstrate that he is probably innocent.[3] The thought of taking a person's life or even depriving him of his liberty when he is probably innocent is repulsive.

The majority holds that "taking into account both the evidence produced in the original criminal trial and the evidence produced in the habeas hearing, the petitioner must persuade the habeas court by clear and convincing evidence, as that standard is properly understood and applied in the context of such a claim, that the petitioner is actually innocent of the crime of which he stands convicted." The court takes great pains to emphasize that, under its new standard for habeas relief, this "clear and convincing evidence" standard means proof substantially greater than what this court previously has considered necessary to have established for this intermediate standard. See *State* v. *Davis*, 229 Conn. 285, 293, 641 A.2d 370 (1994); *State* v. *Jarzbek*, 210 Conn.

whether the petitioner had made a showing of actual innocence sufficient to require a new trial."

[3] Justice Blackmun, writing in dissent in *Herrera* v. *Collins*, 506 U.S. 390, 442–45, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993), and joined by Justices Stevens and Souter, urged the court to adopt a "probably innocent" standard for habeas petitions based on actual innocence. In that capital case, he wrote: "Of one thing, however, I am certain. Just as an execution without adequate safeguards is unacceptable, so too is an execution when the condemned prisoner can prove that he is innocent. The execution of a person who can show that he is innocent comes perilously close to simple murder." Id., 446 (Blackmun, J., dissenting).

396, 397–98, 554 A.2d 1094 (1989); *J. Frederick Scholes Agency* v. *Mitchell*, 191 Conn. 353, 358, 464 A.2d 795 (1983). The majority places "[i]ts emphasis on the *high probability* and the *substantial greatness of the probability* of the truth of the facts asserted [and] indicates that it is a very demanding standard and should be understood as such . . . ." (Emphasis in original.) The court further underscores this heightened standard it adopts by citing to pronouncements of various courts. See *Herrera* v. *Collins*, 506 U.S. 390, 417, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) ("a truly persuasive demonstration of 'actual innocence' "); id., 426 (O'Connor, J., concurring) ("extraordinarily high and truly persuasive demonstration[s] of actual innocence" [internal quotation marks omitted]); *Carriger* v. *Stewart*, 95 F.3d 755, 757 (9th Cir. 1996) (petitioner must " 'unquestionably establish [his] innocence' "); *Ex parte Elizondo*, 947 S.W.2d 202, 206 (Tex. Crim. App. 1996) (requiring "an exceedingly persuasive case that [the petitioner] is actually innocent").

Although this standard is, in itself, impossibly high, the majority proceeds to create an additional requirement that habeas petitioners must satisfy. Specifically, the court states that "the petitioner must establish that, after considering all of [the] evidence and the inferences drawn therefrom, as the habeas court did, no reasonable fact finder would find the petitioner guilty." In other words, the court adopts, as an *additional* requirement, a variation of the standard that Justice White proposed in his concurring opinion in *Herrera* v. *Collins*, supra, 506 U.S. 429 ("no rational trier of fact could [find] proof of guilt beyond a reasonable doubt" [internal quotation marks omitted]). In essence, the majority requires that the habeas petitioner jump through two hoops.

The majority claims that "all of the courts and jurists that have addressed claims of actual innocence have imposed some component that focuses on the likely

effect on a jury or trial court of the evidence of actual innocence." The majority, however, has failed to cite to any case that has required a habeas petitioner to satisfy these two components that the majority adopts. Indeed, the cases to which the majority cites utilize this second "component"—that is, "no reasonable fact finder would find the petitioner guilty"—as the *sole* test in reviewing claims of actual innocence. See, e.g., id. (White, J., concurring) (petitioner must "show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could [find] proof of guilt beyond a reasonable doubt" [internal quotation marks omitted]); *In re Clark*, 5 Cal. 4th 750, 766, 855 P.2d 729, 21 Cal. Rptr. 2d 509 (1993) ("[a]t the guilt phase, such evidence [pointing to actual innocence], if credited, must undermine the entire prosecution case and point unerringly to innocence"); *Ex parte Elizondo*, supra, 947 S.W.2d 209 ("petitioner must show . . . that no reasonable [fact finder] would have convicted him in light of the new evidence"). Moreover, the majority cites *Schlup* v. *Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995), as supportive of this second component, however, that case involved a gateway claim of actual innocence, not, as here, a freestanding claim of actual innocence.[4] In other words, the majority imposes upon habeas petitioners an additional requirement that has no basis in the law of habeas corpus.

The court's decision today signals the continued evisceration of the writ of habeas corpus, the "Great Writ"[5] of liberty. Indeed, since the time that I expressed "my concern on the direction of the majority with regard to the future of the great protector of liberty—the writ of

[4] See footnote 7 of this opinion.

[5] This phrase was first used to refer to the writ of habeas corpus by Chief Justice Marshall in *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807).

habeas corpus"; *Safford* v. *Warden*, 223 Conn. 180, 205, 612 A.2d 1161 (1992) (*Berdon, J.,* concurring); this court's jurisprudence has consistently undermined the Great Writ. See *Summerville* v. *Warden,* supra, 229 Conn. 431 (rejecting standard of proof in habeas proceedings that, "considering the evidence and claims now brought before [the habeas court], together with the evidence produced at the original trial, there is a *probability* of a different result" [emphasis in original]); *Carpenter* v. *Meachum,* 229 Conn. 193, 202, 640 A.2d 591 (1994) (holding that General Statutes § 52-273, which deprives this court of subject matter jurisdiction over writ of error brought to review denial of habeas petition after habeas court has denied certification to appeal, is not unconstitutional); *Simms* v. *Warden,* 229 Conn. 178, 181–85, 640 A.2d 601 (1994) (holding that this court does not have subject matter jurisdiction over writ of error brought to review denial of petition of habeas corpus after habeas court has denied certification to appeal); *Jackson* v. *Commissioner of Correction,* 227 Conn. 124, 131–35, 629 A.2d 413 (1993) (holding that in order for habeas petitioner to be entitled to review of claim not raised on direct appeal, he must show that some objective factor external to defense caused procedural default and that default was prejudicial, thereby abandoning former rule that procedurally defaulted claims were reviewable in habeas proceedings so long as petitioner had not deliberately bypassed his right to review of these claims); *Bunkley* v. *Commissioner of Correction,* 222 Conn. 444, 454, 610 A.2d 598 (1992) (holding that in order to prevail on claim of ineffective assistance of appellate counsel, habeas petitioner must show not only that his appeal would have been sustained but for counsel's deficient performance, but also that there is reasonable probability that trial verdict would have been different); *Johnson* v. *Commissioner of Correction,* 218 Conn. 403, 411–19, 589 A.2d 1214

(1991) (abandoning "deliberate bypass" standard in favor of "cause and prejudice" standard for claims not raised at trial). Because the right to petition for a writ of habeas corpus is protected by our state constitution; see Conn. Const., art. I, § 12;[6] the majority does indirectly what it could not do directly. In other words, instead of a direct assault, the majority cripples the Great Writ's effectiveness so that, as a result, it is nothing more than a paper tiger.

Although the court today chooses to cull out of *Herrera* v. *Collins*, supra, 506 U.S. 429, an extreme standard, I point out that Chief Justice Rehnquist himself suggested in *Herrera* that the states may, and probably should, establish a lower standard of proof than the federal courts when determining the validity of a state court conviction. "As Chief Justice Rehnquist explained in *Herrera,* in determining the appropriate scope of federal habeas review, the federal courts are limited by federalism concerns and by the traditional deference paid to the states in matters of criminal process. . . . Therefore, a claim of actual innocence based on newly discovered evidence is not a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding . . . because [f]ederal courts are not forums in which to relitigate state trials. . . . According to Chief Justice Rehnquist, the federal courts do not have jurisdiction to grant habeas relief for a claim of actual innocence unless the evidence of innocence is so overwhelming that it would be unconstitutional not to grant the petitioner a new trial. . . . State courts face no such limitation.

---

[6] Article first, § 12, of the constitution of Connecticut provides: "The privileges of the writ of habeas corpus shall not be suspended, unless, when in case of rebellion or invasion, the public safety may require it; nor in any case, but by the legislature."

"Although a majority of the United States Supreme Court has adopted strict standards for habeas review that demean our federal charter of liberty, state courts need not and should not go down this same path. This court clearly is not limited by federalism concerns in considering the scope of review that should be afforded to petitioners who have been convicted in our own state courts. Indeed, the applicable statute commands that habeas cases must be disposed of as law and justice require. General Statutes § 52-470 (a)." (Citations omitted; internal quotation marks omitted.) *Summerville* v. *Warden*, supra, 229 Conn. 442–43 (*Berdon, J.*, dissenting). The majority simply ignores this distinction, clings to *Herrera*, and then proceeds to raise the burden higher than suggested by *Herrera*.

As I pointed out in my dissent in *Summerville*, this court should adopt the "probably innocent" standard in reviewing habeas petitions with respect to freestanding claims of innocence.[7] Id., 444. "I recognize that the issuance of a writ of habeas corpus carries with it certain costs. I agree with the majority that it can undermine the societal interest in the finality of judgments, and can make it difficult to retry a person because of

---

[7] A "freestanding claim of innocence" is defined as a claim of innocence "in the absence of proof by the petitioner of an antecedent constitutional violation that affected the result of his criminal trial." *Summerville* v. *Warden*, supra, 229 Conn. 422. A claim based on an antecedent constitutional violation that affects the results of the criminal trial is generally referred to as a "gateway claim of innocence." See footnote 28 of the majority opinion.

Whether " 'new evidence,' that is, evidence that is not cumulative, was not available to the petitioner at his criminal trial, and could not have been discovered by him at that time through due diligence," is required for a freestanding claim of innocence is an open issue as the majority states in footnote 29 of its opinion. Although the issue came before us in *Williams* v. *Commissioner of Correction*, 240 Conn. 547, 692 A.2d 1231 (1997), by way of a certified issue from the Appellate Court, we summarily ruled that certification was improperly granted. In that case, the special public defender who requested certification came before this court and argued the state's position that such new evidence is required. Simply put, in the strange case of *Williams*, there was no case or controversy.

the passage of time. A democratic society such as ours, however, has an important interest in assuring that innocent persons are not put to death or deprived of their liberty. That assurance is, quite simply, what the writ of habeas corpus is all about. The Great Writ 'cuts through all forms and goes to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings, and although every form may have been preserved opens the inquiry whether they have been more than an empty shell.' *Frank* v. *Mangum*, 237 U.S. 309, 346, 35 S. Ct. 582, 59 L. Ed. 969 (1915) (Holmes, J., dissenting)." *Summerville* v. *Warden*, supra, 229 Conn. 443 (*Berdon, J.*, dissenting).

The majority adopts a heightened clear and convincing standard of proof in deference to the interests of judicial expediency. In balancing the relevant interests at stake, however, it is clear that judicial expediency pales in comparison to the societal interest in assuring that a habeas petitioner is not deprived of life or liberty as a result of an unjust conviction. The concern about the injustice that results from the conviction of an innocent person has been expressed in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship*, 397 U.S. 358, 372, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring). Indeed, it has been stated that it is better that ten guilty persons go free than that one innocent person is convicted. See 4 W. Blackstone, Commentaries on the Laws of England (1769) c. 27, p. 352; see also *Furman* v. *Georgia*, 408 U.S. 238, 367 n.158, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Marshall, J., concurring).[8] Simply put, "[t]he

---

[8] Alternative formulations of this fundamental determination consisting of greater ratios reflect the important interest in preventing the erroneous deprivation of one's liberty. See, e.g., J. Fortescue, Commendation of the Laws of England (translation by F. Grigor 1917) c. 27, p. 45 ("[i]ndeed, one would much rather that twenty guilty persons should escape the punishment of death, than that one innocent person should be condemned"); J. May,

policy of finality . . . must yield, as a matter of fundamental due process, to the manifest injustice that would result from the continued incarceration of a demonstrably innocent person." *People* v. *Washington*, 171 Ill. 2d 475, 493, 665 N.E.2d 1330 (1996) (McMorrow, J., concurring).

Furthermore, in considering a petitioner's request for a new trial, this court has always adhered to the standard that such a new trial is ordered if there is a reasonable probability that he or she would be acquitted if retried. In *Bunkley* v. *Commissioner of Correction*, supra, 222 Conn. 445–46, this court applied the reasonable probability standard in the context of a habeas claim of ineffective assistance of counsel. The retrials in such cases pose the same "stale evidence" problems to the state that a new trial based on a claim of actual innocence would involve. In *Summerville* v. *Warden*, supra, 229 Conn. 429–30, this court, in rationalizing why it did not adopt the probability standard in habeas claims of actual innocence but did so in ineffective assistance cases, stated that the latter cases constituted "a breakdown of the traditional adversarial process on which we rely to produce just results." As I stated in my dissent in *Summerville*: "If, however, a probably innocent person has been convicted, then there has been a breakdown of the adversarial process, regardless of whether there exists a specific constitutional violation to blame for the breakdown." Id., 445. Indeed, as one commentator has stated, "[e]ach case of an innocent defendant is 'extraordinary' because in each such case a fundamental miscarriage of justice has occurred. In fact, in each such case, the ultimate failure of justice

---

"Some Rules of Evidence: Reasonable Doubt in Civil and Criminal Cases," 10 Am. L. Rev. 642, 654 (1876), citing T. Starkie, Evidence (8th Amer. Ed., G. Sherwood, ed.) p. 756 ("[t]he maxim of the law is . . . that it is better that ninety-nine . . . offenders shall escape than that one innocent man be condemned" [internal quotation marks omitted]).

has occurred." B. Ledewitz, "Habeas Corpus as a Safety Valve for Innocence," 18 N.Y.U. Rev. L. & Soc. Change 415, 449 (1990–91).

Moreover, the very reasons given by the majority to justify its heightened clear and convincing standard of proof should require the adoption of the "probably innocent" standard. The majority concedes that, although the relevant interests at stake—those of the petitioner and the state—are nearly "evenly weighted," the scale tips in favor of the petitioner's interest. Although the state's interest in finality is a laudable goal, it must yield to basic principles of fundamental fairness, equity and the integrity of the criminal justice system. E. Margolis, "Habeas Corpus: The No-Longer Great Writ," 98 Dick. L. Rev. 557, 586 (1994). Indeed, in capital cases in which the death penalty is sought, the policy interest in making convictions "final" is not only irrelevant; *Teague* v. *Lane*, 489 U.S. 288, 321 n.3, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (Stevens, J., concurring); but also is potentially barbaric in light of the awesome finality of the punishment. See *State* v. *Ross*, 230 Conn. 183, 316, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) (*Berdon, J.*, dissenting). In my view, the petitioner's interest in vindication from wrongful incarceration is so great in comparison to the state's interest in finality that a "probably innocent" standard is essential.

Consistent with the gravity of the petitioner's interest in challenging his or her wrongful incarceration or sentence of death, I would adopt a standard that would inquire whether, in light of newly discovered evidence, it is more likely than not that the petitioner is actually innocent. Indeed, if the habeas court incorrectly *grants* the petitioner's claim and a guilty person is released, the state still has the opportunity to retry him. In light of the potential grave risk of error that a petitioner has

been wrongfully incarcerated and in light of the fact that the state has the ability to retry a successful petitioner following release, I fail to understand why the majority deems it necessary to adopt such a stringent test that will preclude otherwise meritorious habeas petitions.

Furthermore, other jurisdictions have adopted the "probably innocent" standard with respect to the review of habeas petitions. See, e.g., *Enoch* v. *Gramley*, 861 F. Sup. 718, 730 (C.D. Ill. 1994), aff'd, 70 F.3d 1490 (7th Cir. 1995), cert. denied, 519 U.S. 829, 117 S. Ct. 95, 136 L. Ed. 2d 50 (1996) ("The Supreme Court in *Herrera* did not set forth the precise burden of proof applicable in an actual innocence claim. The Court finds, however, that to be entitled to relief based upon actual newly discovered or newly presented evidence and the record as a whole, [the petitioner] is probably innocent."); *Jones* v. *State*, 591 So. 2d 911, 915 (Fla. 1991) ("we hold that, henceforth, in order to provide relief, the newly discovered evidence must be of such a nature that it would *probably* produce an acquittal on retrial" [emphasis in original]); *People* v. *Washington*, supra, 665 N.E.2d 1337 ("relief has been held to require that the supporting evidence be new, material, noncumulative and, most importantly, of such conclusive character as would probably change the result on retrial" [internal quotation marks omitted]).

More than a century ago, the United States Supreme Court stated in *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 95 (1868), that "[t]he great writ of habeas corpus has been for centuries esteemed the best and only sufficient defense of personal freedom." This court, however, continues to trample on the Great Writ. It undermines a fundamental foundation of our democracy—no person shall be denied liberty or life unless that person is guilty beyond a reasonable doubt. The finding that the person is probably innocent is the antithesis of guilt beyond

a reasonable doubt, requiring that his conviction be set aside.

Accordingly, I concur in the judgment,[9] but I dissent with respect to the standard of proof.

MCDONALD, J., dissenting. In November, 1983, a jury convicted the petitioner, Lawrence J. Miller, of viciously assaulting a young girl and boy in Danbury on August 20, 1981. His conviction was later upheld on appeal. *State* v. *Miller*, 202 Conn. 463, 522 A.2d 249 (1987).

In 1996, the trial judge in Miller's habeas corpus hearing ordered him released and granted him a new trial on the basis that he was innocent. The majority upholds the habeas court while announcing a novel and unique standard of reviewing habeas corpus determinations. Because of the far-reaching effect of this decision, I respectfully disagree and dissent.

I

The majority adopts a rule of habeas corpus review of independent claims of actual innocence that is not found in any other jurisdiction. In the ease with which new trials may be ordered, Connecticut will now lead the nation. The court now holds that our standard will be: (1) there was clear and convincing evidence of innocence; and (2) in the circumstances, no rational trier, drawing the same inferences as the habeas judge did, would find the habeas petitioner guilty. See part II A of the majority opinion. This standard leaves every criminal conviction subject to retrial by a habeas judge.

As to the standard's first part, "clear and convincing evidence" means merely that the claim is "highly proba-

---

[9] I agree with the majority that, with respect to the scope of review to be applied by this court in reviewing the findings of the habeas court, this court should conduct an "independent and scrupulous examination of the entire record . . . ." See part II B of the majority opinion.

bly" true. The majority states that it may not be found if the evidence is "loose, equivocal or contradictory."

The majority here seeks to comfort society by stating that Miller is not released outright, but may be faced with a new trial. A trial sixteen years after the event, however, with its continued devastating effect upon the victims and the difficulty of collecting and analyzing evidence is not something that should be ordered in the absence of evidence that unerringly demonstrates the defendant was innocent. *In re Clark*, 5 Cal. 4th 750, 766, 855 P.2d 729, 21 Cal. Rptr. 2d 509 (1993).

The second component of the majority's standard concerns the effect of the evidence supporting a claim of actual innocence upon a juror or judge. The standard emerging in the United States Supreme Court and in the other states is that upon such evidence no reasonable trier of fact could find proof beyond a reasonable doubt or would do so. *Herrera* v. *Collins*, 506 U.S. 390, 429, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (White, J., concurring) ("no rational trier of fact *could* find proof of guilt beyond a reasonable doubt" [emphasis added; internal quotation marks omitted]); *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996) ("[t]he petitioner must show . . . that no reasonable juror *would* have convicted him in light of the new evidence" [emphasis added]). This court adopts the less restrictive "would" standard and goes further by giving controlling weight to the effect of the evidence upon the mind of the habeas judge. Under this standard we are to be bound by the inferences the habeas judge drew from the evidence. We would review the record to ascertain whether there is substantial evidence to support such inferences. The court thereby puts the ultimate issue in the hands of a single judge applying "all of his or her powers of intellect, common sense, judgment, reason, and knowledge of human nature . . . ." This effectively blocks our appellate review of the habeas court's

conclusions. I do not believe the United States Supreme Court or any other jurisdiction has established such a free-ranging commission whether to set aside criminal convictions. I do not agree that such a standard gives due consideration to the public safety, to an innocent convicted person's rights, or to public confidence in our criminal justice system.

II

The facts of this case are these. On August 20, 1981, at about 8:30 p.m., fifteen year old Elizabeth and sixteen year old William were assaulted in Danbury. During the assault, Elizabeth had a face-to-face view of the assailant as he fought with her and she scratched his face, until he beat her unconscious with a handgun. William was handcuffed, then beaten and strangled to unconsciousness. When William regained consciousness, he did not see Elizabeth bloody, half naked and unconscious, and he ran for help. Elizabeth was later found nearby. She suffered a fractured jaw, fractures of both hands, a lacerated liver as well as other head and facial wounds. William suffered many head and facial wounds.

At the scene the police found the bandanna the assailant had worn on his face and had lost during his struggle with Elizabeth and some metal objects identified as parts of a Marksman air pistol. They also had the handcuffs the assailant had put on William.

During the investigation, the police showed to Elizabeth photographs of Miller that she identified on the third occasion as "99 percent sure." Subsequent efforts to have her identify Miller in person at church services were not availing of any identification. On July 12, 1982, however, while at a department store in Danbury, Elizabeth saw and recognized Miller as her attacker. According to Elizabeth, when Miller noticed her in the

store he tried to hide and he avoided eye contact. Elizabeth followed him from the store, took his license plate number and reported this to the police. Miller's arrest followed. Elizabeth testified to these facts at Miller's trial and identified him as the one who had assaulted her and William. She testified she had scratched Miller and hit him in his face during the struggle.

Miller was employed in August, 1981, as a prison guard at the federal correctional institute in Danbury. During his workshift from midnight to 8 a.m. on the night of the assault, a fellow guard noticed abrasions on both his hands, a scratch on his neck and a red line down his face as if he had been in a fight. As a federal prison guard, Miller would also have had access to the Peerless handcuffs found on William. These handcuffs had been sold to the federal government.

Miller claimed to have been at his sister's house in nearby Brewster, New York, at the time of the assault, getting ready to leave with his wife the next day for Atlantic City, New Jersey. He produced testimony that he and his wife had left their children at his sister's for the weekend before he went to work. Miller denied that he was scratched or marked up that night. He claimed that he left for Atlantic City the next morning upon leaving work. He admitted that in applying for emergency leave to take the trip, he gave a false excuse. Miller did produce an Atlantic City hotel receipt as evidence of his stay there on August 21. The reservation, however, was made by the wife of a present prison inmate at the federal correctional institute, and room service at the room was signed for by Maryann Raiko, a person not known to Miller or his wife.

The jury deliberated a short time and found Miller guilty.

At the habeas hearing in 1995 and 1996, Miller produced the testimony of Daniel Johnston. Johnston testi-

fied that he had attacked Elizabeth and William on the night in question. Johnston claimed that he had sexual intercourse with Elizabeth while she was conscious and after she agreed to remove her clothes and have sex with him. He also testified that while managing an apartment complex in Norfolk, Virginia, he had stolen a Marksman air pistol and a pair of Peerless handcuffs from the tenants' rooms. Johnston also testified that he had known Miller for many years, that Miller had been a deputy sheriff in Putnam County, New York, and that he had had many contacts with Miller and Miller's wife after Miller had been arrested for the assaults. Johnston also testified that he, as did Elizabeth and William, had developed poison ivy after the incident.

At the hearing Elizabeth repeated her testimony that Miller had attacked her that night in 1981. She also testified that Johnston was not her assailant.

The habeas court resolved the conflicts between Elizabeth's testimony and that of Johnston in favor of Johnston. Relying on circumstances surrounding Johnston's claims, some corroboration of Johnston's claim that he stole a Marksman pistol in Virginia, the sexual assault committed on Elizabeth of which she was not conscious, and the poison ivy reaction, the trial court concluded that the mosaic of evidence would render Miller's conviction at a trial where Johnston testified unlikely.

The habeas judge, and the majority finds evidence to uphold him, considered Elizabeth's identification of Miller as based "on her sincere belief," but found factors tending to erode confidence in her initial and continuing identification of Miller as her assailant. Thereupon, the habeas court concluded that Miller's continued incarceration was unjust and that he should be released.

Johnston had further testified that he was arrested in New York in December, 1985, for the murder of Isabelle Dell of New York, whose body had been found in Danbury. He testified that he was tried, convicted and sentenced to thirty-eight and one-half years to life imprisonment in New York state. See *People* v. *Johnston*, 147 App. Div. 2d 589, 537 N.Y.S.2d 882 (1989). His complaint was that he should have been tried in Connecticut where the body had been found.

Johnston also testified that in 1991 or 1992 he was visited in prison by two Connecticut state troopers who told him that the fingerprint evidence against him in the Dell case had been fabricated. He stated that the officers then offered Johnston $100,000 in stolen drug moneys and seven years to serve on the Dell murder if he did not go to Connecticut on the Miller case. He testified with respect to that meeting in these words:

"[A trooper] said, 'We don't want you to come back to Connecticut.' He says 'It's too embarrassing.' So I said, 'Well, you're not making sense here.' He says, 'Why do you think we didn't prosecute you for your crime in the state of Connecticut?' I says, 'I still don't follow you.' He says, 'Well, we know your crime happened in the state of Connecticut.' He says, 'We just deferred on it. We didn't want to prosecute you in the state of Connecticut. We didn't want you in the state of Connecticut.' "

Johnston further stated: "I believe they did not want me back, just as I believe the Danbury police department did not want to have the Dell case in the state of Connecticut. I believe they wanted me far away from the state of Connecticut."

It is difficult to credit Johnston's testimony when all the evidence was that he first confessed to the 1981 attack in 1995.

Johnston testified that he wanted to come to Connecticut to expose the corruption in the Dell murder case. In this manner, Johnston attempted to weave his own case into his Miller testimony. The habeas court's observation, therefore, that Johnston's confession would be against his penal interest does not stand scrutiny. Johnston admitted to an offense well beyond the statute of limitations and did so while incarcerated for a life term in New York state with a first parole eligibility date of 2021. It could be believed by a habeas court that his testimony in the Miller case was designed to aid his own claim that he should have been prosecuted in Connecticut. Rather than finding it adverse to his penal interest, some habeas judge could find Johnston's testimony was in support of his quest to overturn his own New York murder conviction.

The habeas court relied on corroborative testimony to find Johnston's evidence persuasive. First, the habeas court focused on the pellet gun parts found at the scene. When Johnston contacted Miller after Miller's arrest, the Marksman parts had been publicly identified at the crime scene. Only sometime in 1982 when the tenant Jack Lee Zollars moved from his apartment in Norfolk, where Johnston had lived and worked, did Zollars notice that his Marksman pellet gun was missing. He could not tell the court whether it had been stolen from his apartment, and he believed it had been lost in his moving out. It, therefore, could not be proven the gun had been stolen before the 1981 assault. Furthermore, before 1981 there had been over three million Marksman pellet guns distributed in the United States. There was no evidence, apart from Johnston's testimony, that Zollars' gun, if it had been stolen by Johnston before the assaults, was the source of the parts left at the crime scene.

With respect to the initials on the pellet gun parts, Johnston prefaced his statement about them by surmis-

ing that a crime scene investigator had marked the gun slide, and he made a similar remark about the bandanna holes surrounded by marks made by the crime laboratory.[1] This hardly corroborated his testimony.

Poison ivy reactions are so common as to prove nothing. When Johnston was admitted to a Virginia hospital on the morning of August 23, 1981, he suffered from acute tonsillitis, pneumonia and a poison ivy rash. At admission, his body showed no signs of a struggle with Elizabeth. A physical examination revealed that his skin was essentially negative except for a poison ivy rash. The record of the physical examination, although noting the location of his rash and old scars over a fractured bone and an operation site, listed no other injuries to his face, neck and hands.

With respect to a sexual assault, the manner of the assaults and the condition of Elizabeth where she was found, well known to Johnston when he gave his statement, strongly suggested one did take place.

Lastly, Johnston gave explicit details of his vaginal, anal and oral rape of Elizabeth. His recitation, vital to his testimony, included conversations with her and her aiding him in intercourse. This the habeas court itself found unbelievable.

It is certainly conceivable that another habeas judge using such intellect, common sense, judgment, reason and knowledge of human nature would conclude that, even should Johnston testify, Miller was likely to be convicted. Such a judge might find credible the testimony of the victim and eyewitness, Elizabeth, who has maintained throughout that Miller was her assailant. Such a judge might consider the signs of a fight Miller

---

[1] Abraham Stolman, then the state's toxicologist, testified at the trial that his office had tested the bandanna and had group typed the human blood found near the knotted end. Since the early 1980s, courts have recognized and admitted much more specific blood identification evidence.

exhibited at work after the assault and his access to the government handcuffs as well. As to Johnston, an experienced habeas judge might dismiss his testimony altogether and find he had no credibility. His record, which includes murder, his having nothing to lose, his stories of sexual acceptance by Elizabeth and his claims about an offer of $100,000 and time served for his promise not to return to Connecticut to testify would clearly support such a conclusion. As to the corroboration found in the Marksman pistol parts, Johnston's poison ivy, and the sexual assault, none of those would require a habeas court to disbelieve the victim and accept Johnston's testimony.

In sum, the granting or denial of Miller's release under the rule now adopted by the majority depends entirely and finally upon the individual habeas judge's assessment of the testimonies of Elizabeth and Johnston.

I believe this court should play a different role in reviewing a habeas corpus petition claiming actual innocence after conviction upon a trial. We should bring to bear on the issue, because of our number, our diverse experiences to measure the question of the weight and effect of all the evidence upon the jury's finding of guilty. In doing so, we should recognize human fallibility and the value of collective jury verdicts.

If we, as a reviewing court, were to play a role in such determinations of innocence, I believe we should measure the evidence by the standard whether it points unerringly to the innocence of Miller and, as announced by Justice White, it is such that no rational trier of fact could find Miller guilty if Johnston were to testify. *Herrera* v. *Collins*, supra, 506 U.S. 429 (White, J., concurring). Here this cannot be said.

Accordingly, I respectfully dissent.